UNITED STATES of America

v.

Joseph A. BOCCANFUSO.

Civ. No. B–87–298 (TFGD).

United States District Court,
D. Connecticut.

Sept. 1, 1988.

Jeremiah Donovan, Ass't U.S. Atty., New Haven, Conn., for plaintiff.

Michael Koskoff, Bridgeport, Conn., for defendant.

## MEMORANDUM OF DECISION

DALY, Chief Judge.

Mr. Boccanfuso has been the owner of properties located at 80, 84 and 88 Harbor Road, Westport, Connecticut since before 1968. The properties abut the Saugatuck River. Between some time before 1968 and 1987 he built three seawall/parking lots along the river on these properties. The United States government brought this action for civil penalties and for the removal of the seawalls and unauthorized fill seaward of the "extreme high tide" (defined below) on the properties at 84 Harbor Road (fill area # 2) and 80 Harbor Road (fill area # 3). With respect to the seawall and groins at 88 Harbor Road (fill area

# 1), the government asks the Court to instruct the Army Corps of Engineers (the "Corps") to resume the after-the-fact permit process for the groins.

The situation presented here illustrates the importance of effective law enforcement to the attainment of the laudable legislative objectives embodied in our public laws. The principal legal issue in the instant dispute concerns the jurisdictional limits of the Corps in its enforcement of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 *et seq.*,[1] and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*[2] The regulatory jurisdiction of the United States under the River and Harbors Act extends "to the line on the shore reached by the plane of the mean (average) high water." 33 C.F.R. § 329.12(a)(2) (1985). Specifically, it is the average of high tides over the past 18.6 years, *id.*, and is often referred to as the "mean high water mark."

Under the Clean Water Act, which is the act governing defendant's conduct here, the regulatory jurisdiction of the United States was not easy to discern in 1985. Prior to November, 1986, the regulations concerning the Clean Water Act were set forth in 33 C.F.R. Part 323 (1985), and the only reference to the jurisdictional limit of the Corps was the following: "The term 'high tide line' is the line used in Sec 404 determinations...." 33 C.F.R. § 323.2(g). The Court finds this jurisdictional reference, which is nestled away in a definitions section, at best less than helpful. The jurisdictional limits of the Corps under the Rivers and Harbors Act of 1899 and the Clean Water Act are difficult enough to decipher without an obscure regulatory reference.

Perhaps that is why section 328 was added to the regulations in November, 1986. *See* 33 C.F.R. § 328 (1987) (the Federal Register promulgating the regulation was published November 13, 1986). Section 328.4, entitled, "Limits of Jurisdiction", explains that the landward limits of jurisdic-

---

1. In general, this act prohibits the obstruction or alteration of navigable waters of the United States without a permit from the Corps.

2. In general, this act prohibits the discharge of dredge or fill material into waters of the United States without a permit from the Corps.

tion in tidal waters extends to the high tide line. 33 C.F.R. § 328.4(b)(1). In both the 1985 and 1987 regulations the term "high tide line" is defined as the line of "intersection of the land with the water's surface at the maximum height reached by the rising tide." 33 C.F.R. § 328.2 (1985) and § 328.3(d) (1987). This line is often referred to as the "extreme high tide", or is sometimes quite confusingly referred to merely as the "high tide line."

The jurisdictional limit under the Clean Water Act, in addition to being obscure, is subject to conceptual confusion. To the trained and careful eye the jurisdictional limit of the Corps under the Clean Water Act is clear; however, when the term "high tide line" is loosely used to delimit the Corps' jurisdictional limit a person untrained in this area of the law may be easily confused. This point is illustrated by a Corps' pamphlet entitled *Regulatory Program Application Information*, May, 1985. Exh. 23. It states on page 5 that "the best way to avoid the need for a permit is to select a site that is above the high tide line. . . ." No further explanation of the term "high tide line" is provided in the pamphlet, although general references to regulations are given. With this background in mind, which is by no means intended to condone ignorance of the law as a defense, the Court shall now review the particular facts of this case.

## FINDINGS OF FACT

Mr. Boccanfuso's long ordeal with the Corps began in June, 1981, when Brian Valiton, who is an inspector with the Corps, discovered that Mr. Boccanfuso was working on groins that extended from fill area # 1 into the river. As a result of this the Corps sent Mr. Boccanfuso a letter stating that "during a routine inspection of Saugatuck Shores, Brian Valiton noticed that you have placed fill below the extreme high water line and that you are constructing a stone groin into the Saugatuck River. . . ." Exh. 3. In fact, Mr. Boccanfuso was merely mending the groins. The letter also contained the following:

You are hereby ordered to Cease and Desist any work seaward of the mean high water line in tidal waters or the ordinary high water line in non-tidal waters or the placing of any fill material seaward of the extreme high tide line and in all waters of the United States and their adjacent wetlands unless expressly authorized to do so by a Corps of Engineers permit.

In correspondence between the Corps and Mr. Boccanfuso, the Corps asserted that its jurisdiction extended to the extreme high water line and required him to submit an after-the-fact permit for fill area # 1. In order to comply with this request Mr. Boccanfuso hired Mr. Campbell, an architect, to prepare the necessary drawings. In February, 1982, Mr. Campbell submitted drawings as a permit application for fill area # 1 and for an additional area, fill area # 2. Because the drawings failed to identify, *inter alia*, the extreme high tide line, the Corps requested in March, 1982 that the application be revised, which Mr. Campbell's office accomplished in November, 1982. Following the issuance of a public notice in February, 1983, the Corps denied the permit application in September, 1983 because Mr. Boccanfuso had a practicable, less damaging alternative. Exh. 11. The Corps required the removal of fill material on fill area # 1 seaward of the extreme high tide line.

The controversy regarding fill area # 1 was largely put to rest in mid–1984. In June, 1984, a meeting attended by Mr. Boccanfuso, Marita Yoder of the Corps, and Sally Bolster, an aide to the late Congressman Stewart McKinney, was held. Through this meeting Mr. Boccanfuso was able to establish that fill area # 1, except for the groins, was built before 1968 and, therefore, was authorized by the Corps' Nationwide permit. *See generally* 33 C.F.R. 330.3 (1985). The Corps invited Mr. Boccanfuso to submit an after-the-fact permit application for the two groins, which he did. The Corps apparently misplaced this application, but was provided with a copy of the original in 1986. No action has been taken by the Corps on that application as yet.

With respect to fill area # 2, Mr. Boccanfuso testified that Ms. Yoder explained that the Corps' jurisdiction extends to the mean high water line. Although it is difficult to imagine someone in the Corps making such a statement, in light of the fact that Mr. Campbell, local officials of the Town of Westport, and others were operating with the understanding that the Corps' jurisdiction extended only to the mean high water line, *see* Exh's 508 and 511, and the fact that no convincing evidence was produced to contradict Mr. Boccanfuso's testimony, the Court credits his testimony.

Mr. Boccanfuso also testified that at this meeting Ms. Yoder informed him that he could place riprap (large stones) to a distance of six feet in front of an existing concrete seawall on fill area # 2. Mr. Boccanfuso did in fact place riprap in front of the old concrete wall in order to provide additional protection from inclement weather. More than a year later, however, hurricane Gloria struck the eastern shore causing substantial damage to the shore line behind the riprap. After this occurance Mr. Boccanfuso decided that a more substantial seawall was needed to protect his property, and so he again called upon Mr. Campbell to prepare drawings for two proposed seawalls, fill areas # 2 and # 3.

In February, 1986, after a telephone conversation with Caroline Bellis of the Corps wherein Mr. Campbell informed her that he wanted to be sure that he did not need a permit for the proposed seawalls, Mr. Campbell submitted the proposed plans. In his cover letter Mr. Campbell indicated that the seawalls are proposed to be built above the mean high tide, and asked for confirmation within ten days that the Corps had no jurisdiction or permit requirement.[3]

By April, 1986, the Corps had not responded to the Boccanfuso permit application. However, on April 4, 1986, Mr. Campbell receive a letter from Mr. Richard Roach. This letter asserts that the Corps' jurisdiction extends only to the mean high water mark under section 10 of the River and Harbor Act of 1899, and indicates that permits are required under section 404 of the Clean Water Act for activities involving fill material in all waters of the United States. Thus, in August, 1986 with all necessary local approvals and no reaction from the Corps other than Mr. Roach's letter, Mr. Boccanfuso proceeded to construct the seawall/parking lot on fill area # 2.

The drawings of the proposed seawall for fill area # 2 followed a zig-zag pattern just landward of the mean high tide. Exh. 19A. In building the seawall this plan was apparently abandoned in favor of a straight line that at one point dips slightly seaward of the mean high tide line. Exh. 39. This departure appears to have been made in order to appease the Westport Conservation Commission's concern that digging footings would cause erosion. Thus, to avoid digging footings the wall was built atop the riprap that had been laid there more than a year before. *See* Plaintiff's Proposed Findings at 19.[4]

On September 2, 1986, after the seawall in fill area # 2 was completed, Mr. Valiton of the Corps made a visit to Mr. Boccanfuso's properties to inspect what the Corps thought was an unauthorized filling activity. During that visit Mr. Valiton explained to Mr. Boccanfuso that the newly constructed seawall appeared to be within the Corps' jurisdiction, and also explained that the Corps' jurisdiction was the high tide line and not the mean high tide line as Mr. Boccanfuso contended. Mr. Valiton also wrote in a Corps pamphlet which Mr. Boc-

---

**3.** The government's argument that Mr. Campbell's letter of February 3, 1986 together with the drawings of the proposed seawalls does not constitute an application is without merit. *See* Exh. 515.

**4.** The seawall in fill area # 2, appears to have been built beyond six feet from the concrete seawall, the limit initially established by Ms. Yoder. Although no direct testimony was produced on this point, an examination of exhibit 17 reveals that six feet beyond the old concrete seawall is approximately 31 feet from the edge of Harbor Road. An examination of exhibit 39 reveals that the seawall constructed by Mr. Boccanfuso in 1986 extends to a point that is approximately 35 feet from Harbor Road. The record reveals no objection to the placement of the riprap by the government.

canfuso had shown Mr. Valiton that the "high tide line not = m.h.w." Exh. 23B, at 5. Before leaving Mr. Valiton indicated that he was not sure what action the Corps would take regarding the seawall in fill area # 2, but that he would get back to Mr. Boccanfuso.

On September 10, 1986, the Corps wrote a letter to Mr. Campbell regarding fill area # 2 stating that Mr. Boccanfuso had filled "seaward of the high tide line (highest predictable tide)...." Exh. 21. The letter also asserted that "[o]n the coastline, our jurisdiction under the Clean Water Act extends to the high tide line (highest predictable tide)...." This letter was not sent to Mr. Boccanfuso by either the Corps or Mr. Campbell, and remarkably Mr. Campbell never mentioned it to Mr. Boccanfuso. Finally, in November, 1986, having heard nothing from Mr. Valiton and anticipating the onset of winter, Mr. Boccanfuso began and completed the seawall in fill area # 3.

## DISCUSSION

The government contends that Mr. Boccanfuso placed fill material, a pollutant, seaward of the high tide line both in fill areas # 2 and # 3 without a permit in violation of the Clean Water Act. There is no question that the placement of these seawalls violates the Clean Water Act. The question here is whether the government should be estopped from pressing these violations against Mr. Boccanfuso.

The equitable principle of estoppel is a flexible one designed to avoid injustice. Estoppel is a bar precluding one from acting against another when the one has made a definite misrepresentation and the other reasonably relies on it to his detriment. *See Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). In *Heckler*, the Court noted that the assertion of estoppel against the government frustrates the government's ability to enforce the law and thereby undermines the public interest in full enforcement of the law. *Id.* at 60, 104

S.Ct. at 2224. It was for this reason that the Court believed that the government may not be estopped on the same terms as a private litigant. *Id.* Indeed, the government in that case urged the Court to bar estoppel altogether against the government, but the Court declined to do so.

This Court is not now inclined to erect an absolute bar to the use of equitable estoppel against the government, and that argument is not urged here.[5] Although the Supreme Court has never held the government to be estopped by the conduct of its agents, it has clearly left open the question of whether in some future case "affirmative misconduct" by the government might warrant an estoppel. *See INS v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (per curiam) (the failure to publicize adequately rights created by an act of Congress does not constitute affirmative misconduct). *See also Heckler*, 467 U.S. 51, 66–68, 104 S.Ct. 2218, 2227–2228 (Rehnquist, J., concurring); *United States v. RePass*, 688 F.2d 154, 158 (2d Cir.1982) ("Equitable estoppel as a defense is not available against the United States, [citations omitted], except in the most serious of circumstances, [citation omitted], not present here."); *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982) (estoppel available against Postal Service for insurance coverage).

The cases dealing with claims of estoppel against the government do not explain what affirmative misconduct is, but rather, what it is not. Thus, in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Court rejected an estoppel claim where a private party relied on a misrepresentation by the Federal Crop Insurance Corporation's local agent for insurance regarding the insurability of certain claims even though duly promulgated regulations barred such insurance coverage. Both Merrill and the government's local agent entered into the insurance agreement because of their innocent ignorance of the law. In *Schweiker v. Hansen*,

---

**5.** In fact the government's proposed conclusions of law do not even address the question of estoppel.

450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam), respondent sued for retroactive benefits and the Court rejected an estoppel argument where a Social Security Administration field representative erroneously told respondent that she was not eligible for benefits. The Court found that the representative's conduct did not cause the respondent to take action or fail to take action that she could not correct. *Id.* at 789, 101 S.Ct. at 1471. The Court also held that a delay, which was not unwarranted, in processing a visa petition did not amount to affirmative misconduct. *INS v. Miranda*, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam). The Second Circuit has also recently rejected an estoppel argument where the government granted an extension for an application for attorney's fees, but later deemed the extension a nullity because the time limitation for the filing of an application under the Equal Access to Justice Act, 5 U.S.C. § 504, is jurisdictional. *Long Island Radio Co. v. N.L.R.B.*, 841 F.2d 474, 478 (2d Cir.1988).

The concept of affirmative misconduct is not easily defined, and the Court shall not now attempt to expound its precise parameters. The Court is, however, cognizant of the need to limit the application of estoppel against the government so as not to undermine public confidence in government and the rule of law.

▋ In order for the equitable principle of estoppel to serve its goal of avoiding injustice, flexibility must continue to be its hallmark. *See Heckler*, 467 U.S. at 59, 104 S.Ct. at 2223. In the context of this case, the Court shall apply the following standard: estoppel shall be a valid defense against the government when, by an affirmative misrepresentation, a responsible government official induces another to act to his detriment, provided such detrimental reliance is reasonable and the person so induced exercised diligent efforts to comply with the law. Applying this standard to the instant case the Court holds that the government is estopped from asserting that Mr. Boccanfuso has violated the Clean Water Act with respect to fill area # 2.

*Fill Area # 2*

Mr. Boccanfuso was affirmatively misled by the Corps. The evidence in this case demonstrates that Ms. Yoder informed Mr. Boccanfuso that the jurisdiction of the Corps extended only to the mean high water mark, and permitted him to place riprap on fill area # 2. Furthermore, over a year later Mr. Boccanfuso, through his agent Mr. Campbell, submitted an application to the Corps in connection with his plan to build a seawall on fill area # 2. Approximately six months later, and after at least two follow up phone calls to the Corps (one by Mr. Boccanfuso and one by Mr. Campbell), the Corps had not asserted its jurisdiction over the proposed project.

Both Mr. Boccanfuso and his agent Mr. Campbell were under the misunderstanding that the Corps' jurisdiction extended only to the mean high water line under the Clean Water Act. This misunderstanding to be sure was due in part to their own ignorance of the law. But where government misconduct leads one down the rosy path of legal breach, public faith in government is not fostered by a rule that penalizes reasonable reliance thereon. The law involving navigable waters of the United States is complicated and confusing, and people who must deal with the maze of regulations in this area depend on proper guidance, and quite naturally rely on information obtained, from those individuals charged with enforcing the law.

The Court is convinced that Ms. Yoder's misrepresentation substantially exacerbated Mr. Boccanfuso's misunderstanding of the Corps' jurisdictional limits. But this alone would not be sufficient grounds for estoppel. When this misrepresentation is combined with the Corps' unwarranted delay in asserting its jurisdiction over the project, however, sufficient grounds for estoppel exist.

The Corps' failure to respond to Mr. Boccanfuso's permit application was unwarranted and a breach of the regulatory process. Applications to the Corps are due a timely decision. 33 C.F.R. § 320.1(a)(4) (1985). The regulations indicate that the Corps shall, if an application is incomplete,

request additional information within 15 days of receipt of the application. 33 C.F.R. § 325.2(a)(1) (1985). In addition, the Corps is required to issue a public notice within 15 days of the receipt of all information. *Id.* ¶ (2). Finally, the regulations establish that the guideline for deciding all applications is 60 days from the receipt of all information. *Id.* ¶ (d)(3).

The Court finds that the Corps' failure to respond *at all* within six months from the time the permit application was filed amounts to affirmative misconduct in the context of this case. The Corps has offered no reasonable explanation for this failure, which occurred notwithstanding repeated phone calls from defendant.

The permit process is at the heart of the Corps' enforcement program. People dealing with United States waters rely on this process in order to ascertain whether or not they are within the Corps' jurisdiction. The Corps' failure to assert its jurisdiction in a timely manner pursuant to the regulations communicated an affirmative message to Mr. Boccanfuso that his project was not within the Corps' jurisdiction.

Mr. Boccanfuso's reliance on the government's errant conduct clearly caused him to change his position to his detriment, as considerable time, effort and most likely money have already been expended on the construction of the seawall/parking lot in fill area # 2. To permit the government to now force him to remove the seawall would further adversely affect him.

Mr. Boccanfuso's adverse reliance on the government's misrepresentation and misconduct was also reasonable. Had Mr. Boccanfuso's sole basis for action here been Ms. Yoder's misrepresentation, the Court would be hard pressed to conclude that his reliance was reasonable. As the Supreme Court has explained, reliance is undermined when based on oral advice because of the less formal nature of oral advice and as a policy matter because of the possibility of fraud. *Heckler,* 467 U.S. at 65, 104 S.Ct. at 2226–2227. This misrepresentation, however, must be examined in light of the fact that: 1) Ms. Yoder authorized Mr. Boccanfuso to place riprap on fill area # 2; 2) the Corps, by its silence, acquiesced in his placement of the riprap; and 3) the Corps failed to respond to his request to verify whether the project fell within the Corps' jurisdiction in a timely manner. Taking these factors together the Court concludes that Mr. Boccanfuso was justified in concluding that his project was not within the Corps' jurisdiction.

Finally, the Court concludes that by submitting, and following up on, his permit application Mr. Boccanfuso exercised diligent efforts to comply with the law.

Accordingly, for the reasons set forth above the government is estopped from asserting that Mr. Boccanfuso has violated the Clean Water Act with respect to fill area # 2.

### *Fill Area # 3*

■ The circumstances surrounding the construction of fill area # 3 do not provide sufficient grounds for estoppel. Prior to the time Mr. Boccanfuso began working on the seawall/parking lot on fill area # 3, he learned from the Corps that its jurisdiction did indeed extend to the high tide line and not to the mean high tide line. He was also informed by the Corps that the seawall on fill area # 2 might be in violation of the Clean Water Act. These facts substantially undermine the reasonableness of Mr. Boccanfuso's continued reliance on the government's previous misconduct. To proceed with construction under these circumstances without any further inquiry to either his architect, Mr. Campbell, or the Corps was aggressive.

Furthermore, the government did make a timely effort to inform Mr. Boccanfuso that he had indeed violated the Clean Water Act. Although the Corps' enforcement efforts could have been more effective, the Court concludes that it was not unreasonable for the Corps to attempt to communicate with Mr. Boccanfuso through his agent. Mr. Campbell offers no legitimate reason for neglecting to relay this important information to Mr. Boccanfuso. The public interest in enforcement of the law will not be frustrated by the inexcusable neglect of one's agent.

Accordingly, the government is not estopped from asserting a violation of the Clean Water Act against Mr. Boccanfuso with respect to fill area # 3. Because Mr. Boccanfuso is clearly in violation of the act, the Court must now consider an appropriate remedy with respect to fill area # 3.

■ The Clean Water Act provides for civil penalties, as well as injunctive remedies. The Court shall first examine the government's request for restoration. A restoration order should be based on a comprehensive evaluation of the particular environmental factors involved and a review of the practicality of the specific restoration ordered. *Weiszmann v. District Engineer, United States Corps of Engineers*, 526 F.2d 1302, 1304 (5th Cir.1976). The only evidence presented in this case regarding environmental impact is the Statement of Findings and Environmental Assessment which was issued by the Corps on September 27, 1983. Exh. 11. Not only is this assessment nearly five years old, but it was made in connection with an application for fill areas # 1 and # 2. Absent timely and specific evidence with respect to fill area # 3 the Court will not issue an injunction. Instead, the Court orders that, in accordance with 33 C.F.R. § 326.3(e) (1987), the Corps allow Mr. Boccanfuso to submit an after-the-fact permit application regarding fill area # 3 no later than October 7, 1988.[6]

■ The Clean Water Act also provides that a person violating the act shall be subject to a civil penalty not to exceed $25,000 per day for each violation. The statute directs the court to consider the following factors in determining the amount of a civil penalty: 1) the seriousness of the violation, 2) the economic benefit, if any, resulting from the violation, 3) any history of such violations, 4) any good-faith efforts to comply with the applicable requirements, 5) the economic impact of the penalty on the violator, and 6) such other matters as justice may require. 33 U.S.C. § 1319(d) (1988 Supp.).

**6.** The Court assumes that the Corps will resume its review of Mr. Boccanfuso's after-the-fact per-

In the context of this case, the Court orders the defendant to pay a civil penalty in the amount of $2,000.00 by October 7, 1988. Mr. Boccanfuso's violation on fill area # 3, although without ill intent, is inexcusable and cannot be condoned.

mit application with respect to the groins on fill area # 1.