**UNITED STATES of America, Appellant,**

v.

**Joseph A. BOCCANFUSO, Appellee.**

**No. 902, Docket 88–6256.**

United States Court of Appeals, Second Circuit.

Argued April 28, 1989.

Decided Aug. 9, 1989.

---

Michael P. Healy, Dept. of Justice (Jacques B. Gelin, Scott A. Schachter, Dept. of Justice, Donald A. Carr, Acting Asst. Atty. Gen., Land & Natural Resources Div., Washington, D.C., Stanley A. Twardy, Jr., U.S. Atty., D.Conn., New Haven, Conn., Jeremiah Donovan, Asst. U.S. Atty., Old Saybrook, Conn., of counsel), for appellant.

Richard A. Fuchs, Koskoff, Koskoff & Bieder, P.C., Bridgeport, Conn. (Michael P. Koskoff, Vincent M. Musto, Bridgeport, Conn., of counsel), for appellee.

Before OAKES, Chief Judge, and TIMBERS and MESKILL, Circuit Judges.

OAKES, Chief Judge:

This appeal involves the question whether the Government is estopped from asserting a claim against a landowner for a violation of the Clean Water Act, 33 U.S.C. §§ 1251 et seq. (1982 & Supp. V 1987) ("the Act"). The landowner, Joseph Boccanfuso, placed fill and constructed a seawall in waters of the United States without a section 404 permit, *see id.* § 1344, from the Army Corps of Engineers ("the Corps"). *See id.* § 1311(a). The United States District Court for the District of Connecticut, T.F. Gilroy Daly, Judge, held that although the seawall and fill violated the Act, the Government was estopped from asserting a claim against Boccanfuso. *United States v. Boccanfuso,* 695 F.Supp. 693, 695 (D.Conn.1988). The district court found that the combination of an oral misstatement of the Corps' jurisdiction by a Corps official and the Corps' failure timely to process Boccanfuso's application for a section 404 permit amounted to sufficient affirmative misconduct by the Corps for the Government to be estopped. We reverse and remand.

Boccanfuso owns three pieces of property at 80, 84, and 88 Harbor Road ("Areas # 3, # 2 and # 1," respectively), abutting the Saugatuck River in Westport, Connecticut. Although at various times all three areas have been the subject of extensive

dealings between the Corps and Boccanfuso, only Area # 2 is at issue on this appeal.

A brief description of the jurisdiction of the Corps may help to explain Boccanfuso's claimed confusion. The Corps asserts that Boccanfuso violated the Clean Water Act. Under that act, the Corps' jurisdiction extends inland to the "high tide line," 33 C.F.R. § 328.4(b) (1988), which the district court noted is often referred to as the "extreme high tide." A potential source of confusion for Boccanfuso is that the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 et seq., gives the Corps jurisdiction up to the "mean (average) high water" line, which is the average point reached by high tides over 18.6 years, see 33 C.F.R. § 329.12(a)(2) (1988). The Corps' jurisdiction under the Clean Water Act is greater than its jurisdiction under the Rivers and Harbors Act; there was testimony that on Boccanfuso's property, the high tide line was about a foot higher than the mean high water line, or, according to Boccanfuso's brief on appeal, ten to fifteen feet further inland. The structures that Boccanfuso built in Area # 2 were landward of the mean high water line, so they were within the Corps' Clean Water Act jurisdiction, but not its Rivers and Harbors Act jurisdiction. Boccanfuso's stance at trial was that he was unaware of the Corps' more extensive Clean Water Act jurisdiction.

In 1981, during a routine inspection, Brian Valiton, a Corps inspector, discovered that Boccanfuso had placed fill below the extreme high water mark in Area # 1 and was mending jetties in that area. In a letter dated June 16, 1981, the Corps ordered Boccanfuso to cease and desist

> any work seaward of the mean high water line in tidal waters or the ordinary high water line in non-tidal waters or the placing of any fill material seaward of the extreme high tide line and in all waters of the United States and their adjacent wetlands unless expressly authorized to do so by a Corps of Engineers permit.

Letter from Robert J. Desista to Joseph Boccanfuso (June 16, 1981), *quoted in Boccanfuso*, 695 F.Supp. at 695. The Corps directed Boccanfuso to submit an after-the-fact application for Area # 1. To comply with the Corps' mandate, Boccanfuso hired a marine architect, Ed Campbell, to draft the necessary drawings for the application. In February 1982, Campbell submitted plans for the pre-existing structures in Area # 1 and for planned improvements to Area # 2. The Corps returned Campbell's plans for revision, requesting, inter alia, identification of the extreme high tide line. Following the resubmission of Boccanfuso's plans in November 1982 and a public notice in February 1983, the Corps denied Boccanfuso a section 404 permit because there was a less damaging alternative: developing above the high tide line.

Meanwhile, from June 1981 through June 1984, Boccanfuso sought to convince the Corps that fill Area # 1 had been constructed prior to 1968 and was therefore grandfathered under a then-existing nationwide permit. As part of this endeavor, Boccanfuso met in June 1984 at his home on Harbor Road with Marita Yoder of the Corps and Sally Bolster, a representative from the late Congressman Stewart McKinney's office. Yoder told Boccanfuso that the Corps' jurisdiction extended only to the mean high water mark and that he could place riprap (large stones) in front of an old seawall in Area # 2, and Boccanfuso later did so.

Apparently in the wake of the havoc wreaked along the Saugatuck shoreline by Hurricane Gloria in 1985, Boccanfuso asked Campbell to prepare drawings for two new seawalls in Areas # 2 and # 3. The proposed seawall in Area # 2 was to be situated in the same area as the one that the Corps had rejected in 1983, although it would lie a few feet landward. On February 3, 1986, Campbell submitted the plans with a cover letter requesting that the Corps respond within ten days if the proposed seawalls came within its jurisdiction. According to Campbell's letter, the proposed seawalls were to be built above the mean high tide line. No formal application form accompanied the plans. The Corps did not respond directly to Campbell's written request. Campbell did receive a gener-

al mailing from the Corps on April 4, 1986, advising him of its jurisdiction, but the letter did not tell which water line determines Clean Water Act jurisdiction:

> A Corps of Engineers permit is required for all work beyond mean high water in navigable waters of the United States under Section 10 of the River and Harbor Act of 1899. * * * Permits are also required under Section 404 of the Clean Water Act for those activities involving the discharge of dredged or fill material in all waters of the United States, including not only navigable waters of the United States, but also inland rivers, lakes and streams and their adjacent wetlands.

Letter from Richard Roach to Edward Campbell (Apr. 4, 1986).

Boccanfuso testified that he telephoned a Corps official named Chris Lindsay, who sent Boccanfuso on April 10, 1986, a pamphlet with the highlighted statement: "The best way to avoid a need for a permit is to select a site that is above the high tide line and avoids wetlands." At a meeting of the Westport Planning and Zoning Commission on April 17, 1986, an urban planner told Campbell that a Corps official had informed the planner that the Corps' jurisdiction under the Act extended to "mean tide," which was one foot above the mean high water line mentioned in the April 4 general mailing. Boccanfuso, nevertheless, constructed the seawall in Area # 2 in August 1986.

Shortly thereafter, Valiton, the Corps inspector, examined Boccanfuso's newly constructed seawall in Area # 2 and advised him that it appeared to be within the Corps' jurisdiction, i.e., below the extreme high tide line. On September 10, 1986, the Corps wrote to Campbell, advising him that the Corps' jurisdiction extended to the extreme high tide line and that Boccanfuso had placed fill seaward of that line in Area # 2. However, a copy of the letter was never sent to Boccanfuso and, surprisingly, Campbell apparently never mentioned it to him. In November 1986, Boccanfuso constructed his seawall in Area # 3.

The district court found that Boccanfuso's construction of the seawalls in Areas # 2 and # 3 violated the Act. However, the court held that the Government was estopped from enforcing the Act with regard to Area # 2 because of the misleading statements of Marita Yoder and the Corps' failure timely to process Boccanfuso's application. The district court found that these two events together constituted affirmative misconduct by the Corps so that estoppel applied. However, with regard to Area # 3, the district court found that the Government was not estopped and ordered Boccanfuso to file an after-the-fact permit and pay a fine of $2,000. That holding was not appealed.

## DISCUSSION

On appeal, the Government argues that it should not be estopped from asserting claims against Boccanfuso for violations of the Act because: (1) his reliance on an oral misstatement by a Corps official was not reasonable in light of the numerous correct oral and written representations that the Corps made to Boccanfuso and Campbell as to its jurisdiction; and (2) the Corps' conduct, i.e., Yoder's statements and the failure timely to process Boccanfuso's section 404 application, did not amount to affirmative misconduct. We accept both of these arguments.

The principle of equitable estoppel is not applied to the Government on the same terms as it is to private citizens. *See Heckler v. Community Health Servs.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam); *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383, 68 S.Ct. 1, 2, 92 L.Ed. 10 (1947). The different standard for estoppel of the Government springs from the tenet that estoppel would frustrate the Government's ability to enforce the law and, in turn, undermine the public interest in full enforcement of the law. *Community Health Servs.*, 467 U.S. at 60, 104 S.Ct. at 2224.

*Community Health Services* requires that a private party asserting estoppel against the Government demonstrate first "that the traditional elements of an estoppel are present." *Id.* at 61, 104 S.Ct. at 2224. Thus, a party must show that the Government made a misrepresentation upon which the party reasonably relied to its detriment:

"If, at the time when [the party] acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation...."

*Id.* at 59–60 n. 10, 104 S.Ct. at 2223 n. 10 (quoting 3 J. Pomeroy, *Equity Jurisprudence* § 810, at 219 (S. Symons ed. 1941)). *See generally* K. Davis, *Administrative Law Treatise* ch. 20 (2d ed. 1983) (chapter discussing estoppel, retroactivity, and inconsistency).

While this circuit has occasionally found the Government to be estopped, we have done so only in very limited and unusual circumstances. *See Corniel–Rodriguez v. INS*, 532 F.2d 301, 307 n. 18 (2d Cir.1976) ("Our holding is limited to the extraordinary circumstances before us."); *Scime v. Bowen*, 822 F.2d 7, 9 (2d Cir.1987) (holding that the Government was not estopped when erroneous information was given to claimant by an agent of the Social Security Administration and noting that *Corniel–Rodriguez* was limited to its facts by *Goldberg v. Weinberger*, 546 F.2d 477, 481 n. 5 (2d Cir.1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977)). Although the Corps' conduct may have been less than exemplary in this case, we hold that there is no estoppel in this case because Boccanfuso could not have reasonably relied on any Government misrepresentation.

The district court found that in June of 1984, Yoder erroneously told Boccanfuso that the Corps' jurisdiction extended only to the mean high water line and that Yoder gave him permission to place riprap in front of an old seawall in Area # 2. But, as the district court noted, Yoder's misrepresentation, standing alone, was insufficient to estop the Government. 695 F.Supp. at 698, 699. Indeed, as the district court noted, *id.* at 699, oral statements by Government employees or agents are not accorded the same weight as written ones, *Community Health Servs.*, 467 U.S. at 65, 104 S.Ct. at 2226; *see also Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam) (rejecting argument that oral misstatement by Social Security official created estoppel).

The district court, considering Yoder's misrepresentation in combination with other events, found that Boccanfuso's reliance was reasonable. The other events that the district court considered were Yoder's granting of permission to place the riprap, the Corps' acquiescence to the placement of the riprap, and the Corps' failure timely to respond to the 1986 application. We find, however, that in light of the numerous correct written and oral statements that the Corps made regarding its jurisdiction to both Boccanfuso and Campbell, it was error for the district court to find that Boccanfuso reasonably relied on Yoder's oral misstatement.

The record here shows that throughout the course of dealings between the Corps and Boccanfuso, information as to the Corps' jurisdiction was readily available to Boccanfuso and to Campbell in his capacity as Boccanfuso's agent. Of particular relevance is the location of the seawall in Area # 2, which is quite similar to that of the seawall rejected in 1983. Also, there were many references to the extreme high tide line in the correspondence that the Corps sent to Boccanfuso over the years. A letter dated June 16, 1981, regarding Area # 1 noted that Boccanfuso had placed fill "below the extreme high water line" and ordered him to stop placing fill "seaward of the extreme high tide line." Letter from Robert J. Desista to Joseph Boccanfuso (June 16, 1981). A subsequent letter addressed the Corps' "jurisdiction ..., particularly [the Area # 1] construction ... and fill ... below the extreme high waterline." Letter from Richard Roach to Joseph Boc-

canfuso (Nov. 6, 1981). When in 1982 Campbell sought permission to make improvements in Area # 2, the Corps required him to amend his drawing to identify the "high tide line" on the plans, which already showed the mean high water line, and his office added a line annotated as "E.H.T." When the Corps denied that application in September of 1983, it noted Boccanfuso's alternative of strengthening the existing structure "above H.T.L." or "above E.T.L.," and the Corps ordered him to restore the area by removing the structures and grading and planting "the area from E.H.T. to M.L.W. lines." Letter from Carl B. Sciple to Joseph A. Boccanfuso (Sept. 29, 1983). A 1984 letter, which acknowledged that the structure in Area # 1 could stay, invited Boccanfuso to file an after-the-fact permit application for two jetties and noted that the plans should show "mean low water (0.0'), mean high water (7.0'), and the high tide line (8.4')." Letter from Richard Roach to Joseph Boccanfuso (July 11, 1984). Thus, Boccanfuso, or Campbell acting on his behalf, had or should have had knowledge of the Corps' jurisdiction under the Act from prior communications and dealings with the Corps, even if the Corps' conduct in 1986 left something to be desired.

Although Boccanfuso argues that Yoder's granting permission for the placement of riprap in front of an old seawall in Area # 2 in 1984 led him further down the path of reasonable reliance, this claim is unavailing. We have already rejected his claim of reasonable reliance on the misstatement of jurisdiction. It would also have been unreasonable for Boccanfuso to presume that the permission to lay the riprap was a waiver of jurisdiction. The Corps' regulations permit the maintenance of "currently serviceable structures" without a section 404 permit. 33 C.F.R. § 323.4(a)(2) (1988). That Boccanfuso received specific, written permission from the Corps for the installation of the riprap, *see* letter from Richard Roach to Joseph Boccanfuso (July 11, 1984), makes it clear that the Corps did not disclaim regulatory jurisdiction.

Even if we did not find Boccanfuso's claimed reliance unreasonable, we would reject the district court's determination that the Corps' failure timely to process Boccanfuso's application amounted to affirmative misconduct. Although the district court may have correctly found that the Corps' unresponsiveness "was unwarranted and a breach of the regulatory process," *Boccanfuso*, 693 F.Supp. at 698, the court erred in applying this finding.

The Corps cannot be estopped from enforcing the Act on the ground that it failed to follow the deadlines established by its own regulations. The district court overlooked the distinction between statutorily mandated deadlines and those imposed by the agency's own regulations. Federal agencies do not lose jurisdiction by their failure to comply with statutory time limits unless the statute demonstrates congressional intent that this result occur, *Brock v. Pierce County*, 476 U.S. 253, 266, 106 S.Ct. 1834, 1842, 90 L.Ed.2d 248 (1986), and the Court is reluctant to void subsequent agency action when an agency has failed to observe a procedural requirement but important public rights are at stake and less drastic remedies are available, *id.* at 260, 106 S.Ct. at 1839.

Here, the requirement of timely processing of applications by the Corps is not congressionally mandated. Boccanfuso argues that the Corps violated several of its own deadlines, *see* 33 C.F.R. § 325.2(a)(1) (Corps shall request more information from applicant within 15 days), *id.* § 325.2(d)(3) (time limits for evaluation process), *id.* § 320.1(a)(4) ("timely decision" thought essential), but he cites no statutory basis for these deadlines. This violation of an agency-imposed regulation does not bar the enforcement of the Act. *See Bersani v. Deland*, 640 F.Supp. 716, 718–19 (D.Mass. 1986) (although regulation had time limit, "[n]othing in either the statute or the legislative history even suggests that Congress intended to elevate timeliness over the objectives of the Act with a consequent bar to its enforcement.").

Further, a less drastic remedy than building the wall was available to Boccanfuso.

Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. (1982 & Supp. IV 1986), Boccanfuso could have brought an action in the district court for judicial review of the Corps' failure timely to process his section 404 permit application. As the Government argues, Boccanfuso should not be permitted to circumvent the APA and then raise the defense of estoppel.

In sum, because Boccanfuso could not have reasonably relied on any Government misrepresentation as to jurisdiction, we hold that the Government was not estopped as to Area # 2, reverse, and remand to the district court for further proceedings in accordance with this opinion.

Reversed and remanded.

TIMBERS, Senior Circuit Judge, dissenting:

The essential question presented by this appeal is whether, in view of the undisputed record of repeated bureaucratic bungling on the part of the government which led a landowner to believe that his seawall was properly located, the government will be permitted to order the demolition of the seawall which the landowner constructed at enormous expense to retard the erosion of his property and the undermining of the adjacent public road. The district court answered this question "No". I say "No". The majority says "Yes". Hence this dissent.

I regret that I am unable to concur in the majority opinion. I am unable to do so because I believe that Judge Daly correctly held, after a bench trial, that on the facts of this case the conduct of the Army Corps of Engineers (Corps or government) was so seriously misleading and deficient that it was sufficient both to estop an ordinary litigant and to constitute the affirmative misconduct necessary to estop the government. For the reasons set forth below, I would affirm on Judge Daly's excellent,

well-reasoned opinion. 695 F.Supp. 693 (D.Conn.1988). From the majority's refusal to do so, I respectfully dissent.

I.

In view of the careful, detailed findings of fact by Judge Daly and since we must determine whether his findings are clearly erroneous, I believe that this case deserves a more comprehensive statement of the facts than the skeleton statement found in the majority opinion.

Appellee Joseph Boccanfuso owns three adjoining lots—80, 84 and 88 Harbor Road—abutting the Saugatuck River in Westport, Connecticut. He has resided at 88 Harbor Road for more than twenty years—since 1968 or earlier. His mother and brother live in homes located on the other two lots.

In an application dated May 24, 1968, appellee requested the Corps to issue a permit to allow him to build a seawall that included a patio and dock along the shoreline in front of 88 Harbor Road (fill area number 1). The proposed seawall and dock would extend to seaward of the mean high water line (MHW). As such it was within the Corps' regulatory jurisdiction under the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. §§ 401 et seq. (1982 & Supp. V 1987).[1] On July 22, 1968, the Corps granted appellee the permit for which he applied (1968 RHA permit) to construct the seawall, patio and dock. Appellee completed the seawall sometime prior to December 1968.

Despite the construction of the seawall, severe erosion problems continued along the beach in front of the seawall. In an effort to correct this problem, in the mid-1970s appellee constructed two stone groins jutting out from each end of the seawall. Although a permit under the RHA was required to construct these groins, appellee did not obtain one.

---

1. The mean high water line is the line representing the average height reached by high tide over the preceding 18.6 years. The river and bank to seaward of MHW are within the Corps' jurisdiction under the RHA. 33 U.S.C. § 403 (1982 & Supp. V 1987); 33 C.F.R. § 322.2(a) (1988). As stated below, the Corps' jurisdiction has since been expanded to landward of MHW under the Clean Water Act.

At about this time the jurisdiction of the Corps was extended to landward of MHW as a result of amendments to the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (1982 & Supp. V 1987) (CWA). This expansion of jurisdiction, as summarized in a series of obscure and complex regulations, extended the Corps' jurisdiction to landward of MHW to a line alternately known as the high tide line, the extreme high tide line or the extreme high water mark. I shall refer to this line by the acronym for its most common description (HTL).[2] At appellee's lots, HTL is about one foot vertically above MHW. This represents a distance of about 15 feet along the slope of the beach in front of the lots.[3]

Appellee's difficulties with the Corps began in June 1981. At that time a Corps employee inspecting the Saugatuck River shoreline noticed appellee repairing and improving the groins in front of the seawall. In the opinion of the Corps the seawall, dock and groins were in violation of CWA permit requirements and the provisions of the 1968 RHA permit issued to appellee. It sent appellee a cease and desist order directing him to stop all work on the seawall and groins.[4] In a follow-up letter dated August 25, 1981,[5] the Corps directed appel-lee either to remove the groins or to apply for an after-the-fact permit for the groins as well as for any other deviations from the provisions of the 1968 RHA permit in the seawall and dock.

The Corps rejected appellee's first application for an after-the-fact permit because it was insufficiently detailed.[6] Appellee then hired Ed Campbell, a marine architect, to prepare and submit the application. On February 10, 1982, Campbell submitted an application, including drawings, for an after-the-fact permit to retain the groins and the alleged deviations in the seawall from the 1968 RHA permit. Campbell, at appellee's direction, also included in the application a request for a permit to extend the existing seawall in front of lot 88 so that it would extend along appellee's lot at 84 Harbor Road (fill area number 2).

A month later, the Corps returned Campbell's drawings as insufficient. It requested among other things that Campbell indicate HTL on them. The Corps did not state why it wanted HTL indicated on the drawings. Campbell complied and sent the drawings back to the Corps in November 1982. Campbell apparently did not recog-

---

**2.** HTL is the line reached by the *greatest* high tide in the preceding year, excluding high tides caused by unusual events such as storm surges. 33 C.F.R. § 328.3(d) (1988). Compare this to MHW, which is the *average* height reached by all high tides during the previous 18.6 years. Obviously, the two are not the same: the average point reached by a series of high tides always will be less than the highest tide recorded. Nevertheless, as the district court stated, "when the term 'high tide line' is loosely used to delimit the Corps' jurisdictional limit a person untrained in this area of the law may be easily confused." 695 F.Supp. at 695. As stated below, even persons such as marine architects, local government officials and Corps employees often confuse HTL with MHW.

**3.** Following the expansion of the Corps' jurisdiction to HTL under the CWA, the Corps issued a Nationwide Permit to bring all projects built below HTL prior to December 18, 1968 into compliance with the Corps' CWA permit requirements. 33 C.F.R. § 330.3 (1988). Since the seawall in fill area number 1 was completed prior to December 1968, it was covered by the Nationwide Permit. The groins, however, were not covered by this permit since they were completed in the mid–1970s.

**4.** Of all the communications sent by the Corps to appellee or his agents between June 1981 and September 1986, this is the only one which clearly stated that the Corps' jurisdiction under the CWA extended "landward to the extreme high tide line". The others, as we point out below, all contained obscure and confusing references to the Corps' CWA jurisdiction which contributed to appellee's belief that both HTL and MHW referred to the same line.

**5.** This letter sets forth at best an oblique reference to the Corps' jurisdiction as extending landward to HTL. It stated that, if appellee wanted to retain fill for an access ramp that extended below HTL and that was built to aid in repairing the groins, he would have to obtain an after-the-fact permit.

**6.** In the letter communicating its rejection of appellee's application, the Corps referred to appellee's placement of fill below HTL. This letter—as with the Corps' other communications in the instant case—neither explains what HTL is nor why it is important.

nize the significance of the Corps' request at the time. He later testified that at that time he thought the request was merely "a housekeeping thing", and that both MHW and HTL referred to the same thing.[7]

In September 1983, the Corps denied appellee's latest permit application in its entirety. It ordered appellee to remove the groins and that part of the seawall extending below HTL. The Corps issued this order on the ground that it never had approved any filling below HTL. Not surprisingly, appellee was dismayed by the removal order, since he had been issued an RHA permit to construct the seawall.[8] He retained an attorney to appeal that part of the removal order pertaining to the section of the seawall which extended below HTL.

A series of letters then passed between the Corps and appellee's attorney. Appellee claimed that, with the exception of the groins, the seawall in fill area number 1 had been authorized by the Corps. The Corps disputed this claim. Eventually, appellee enlisted the aid of the office of the late Congressman Stewart McKinney. The Congressman's office arranged for a meeting between a Corps official, Marita Yoder, and appellee which included a visit to appellee's property to view the seawall. The meeting took place in June 1984. During this meeting appellee convinced Yoder that the seawall was covered by Corps permits. Moreover, Yoder invited appellee to submit a new after-the-fact permit application for the two groins.[9]

During Yoder's visit to the seawall appellee asked her about extending the seawall along fill area number 2 to alleviate the flooding and erosion which was destroying the beach there. Yoder told appellee that the Corps' jurisdiction extended to landward only as far as *MHW*.[10] She also told him that he could construct a riprap seawall in fill area number 2 as long as it remained to landward of MHW. In a follow-up letter dated July 11, 1984, the Corps stated that appellee could retain the seawall in fill area number 1 and asked him to include both MHW and HTL in any drawings for the after-the-fact permit application it had requested for the two groins. Once again the Corps did not explain the significance of its request that appellee include HTL in his drawings. Most important for our purposes, however, the Corps confirmed that appellee could construct the riprap seawall consistent with the statements made by Yoder during her visit.

Appellee built the riprap seawall in fill area number 2 just to landward of MHW. This naturally placed it to seaward of HTL and thus within the Corps' jurisdiction. The Corps, however, failed to discover this violation. More than a year later Hurricane Gloria struck and heavily damaged the area behind the riprap seawall. This caused appellee to decide that he needed a more substantial seawall in fill area number 2. He retained Campbell to prepare drawings for a second seawall/patio along fill area number 2, and for a third seawall/patio in front of 80 Harbor Road (fill

7. Although a professional marine architect, Campbell believed that the Corps' jurisdiction under both the RHA and CWA extended only to seaward of MHW, and that the terms "high tide line" and "HTL" were merely alternative ways of referring to MHW, rather than terms referring to an entirely different concept. This misconception was quite common.

8. It is unclear why the Corps believed that the seawall was unauthorized despite the 1968 RHA permit, as well as the Nationwide CWA Permit. The obvious explanation is bureaucratic bungling, which is found throughout this case.

9. Appellee promptly submitted such an application, which the Corps promptly lost—consistent with its administrative record of bungling throughout this case. Appellee submitted a second application in 1986 upon which, as of the

time the district court filed its opinion in September 1988, the Corps had not yet acted.

10. At trial the government disputed appellee's claim that Yoder told him that the Corps' jurisdiction extended to landward only as far as MHW. Yoder had left the Corps and moved to Japan. She did not testify at trial either in person or by a deposition. In view of the absence of any testimony by Yoder, the confusion concerning the Corps' jurisdiction and appellee's demeanor at trial as the court observed it, the court accepted appellee's version of events. This finding not only is not clearly erroneous, but it strikes me as illustrating precisely the function we entrust to district judges and which should not be lightly disturbed on appeal.

area number 3). Campbell prepared drawings for two new seawalls running just above MHW along fill areas numbered 2 and 3. After completing the drawings, Campbell telephoned Caroline Bellis, a Corps official, and asked whether the proposed seawalls would be within the Corps' jurisdiction. Campbell testified at trial that Bellis told him that as long as the seawalls were built above *MHW*, appellee did not need a permit. The government did not dispute this conversation.

Campbell then sent a copy of the drawings of the proposed seawalls/patios to Bellis under a covering letter dated February 3, 1986, asking her to confirm that, since the proposed construction would be to landward of MHW, no permit would be required. He requested a response within 10 days. The Corps failed to answer Campbell's letter, even though its officials later admitted that they treated the letter as a permit application. They also admitted that Corps regulations required that the Corps request any additional information needed to process an application within 15 days of receipt and to rule on the application within 60 days of receipt. 33 C.F.R. §§ 325.2(a)(1); 325.2(d)(3) (1988).[11]

Several months passed during which Campbell heard nothing from the Corps. He therefore telephoned to find out the status of his February 3 request. He was told only that the Corps would "get back to" him.[12] On April 10, appellee telephoned the Corps to find out the status of his request. The Corps' official with whom appellee spoke told him that the Corps' jurisdiction extended to HTL. By this time appellee—like Campbell—had come to believe that HTL and MHW were one and the same. The Corps sent appellee a pamphlet which highlighted the language "[t]he best way to avoid a need for a permit is to select a site that is above the high tide line." The significance of this language escaped appellee, believing as he did that HTL and MHW were the same.

At about this time, the widespread confusion over the Corps' jurisdiction was further demonstrated by statements of several Westport town officials who were called upon to approve appellee's seawalls. These officials had dealt with the Corps before and believed—like appellee and Campbell—that the Corps' jurisdiction extended only to seaward of MHW.[13] They

---

**11.** The government now argues on appeal that Campbell's letter was not an application because it did not contain a permit application form and did not contain the information that appellee submitted in his 1982 application for a permit to build a seawall in fill area number 2. The district court correctly rejected this silly argument after trial, 695 F.Supp. at 696 n. 3, finding that the Corps treated Campbell's letter as a permit application. Again, this finding is not clearly erroneous.

**12.** About this time, Campbell received a letter from the Corps concerning its jurisdiction. It appears to have been part of a general mailing by the Corps to marine architects. Although the letter contained an explicit description of the Corps' jurisdiction under the RHA, it contained only a general and vague explanation of the Corps' CWA jurisdiction that did nothing to clear up the confusion that Campbell had concerning the Corps' jurisdiction. The letter described the Corps' CWA jurisdiction as extending to "activities involving the discharge of dredged or fill material in all waters of the United States, including not only navigable waters of the United States, but also inland rivers, lakes and streams and their adjacent wetlands." This description did not state where the Corps' jurisdiction ended. And compare this with the

description in the same letter of the Corps' RHA jurisdiction: "A Corps ... permit is required for all work beyond mean high water in navigable waters of the United States." Why the Corps would make its RHA jurisdiction clear but make its CWA jurisdiction confusing is one of the many instances of bungling conduct on the part of the Corps in this case.

**13.** The government claims that the town officials were not confused, pointing to the following entry in the minutes of the Westport Planning and Zoning Commission:

"Mrs. Donahue [apparently a Commission member] said the [Corps] says they have no jurisdiction. Mr. Minor [a Commission official] said they are giving the limits of their jurisdiction. He telephoned [a Corps' official], who said the Corps jurisdiction is mean tide [sic], which is something different than what the letter says, as mean tide [sic] is one foot above mean high [sic]."

Campbell was present at this meeting. It is suggested that this should have put him as well as appellee straight concerning the Corps' jurisdiction. The only two things that this entry suggests to me, however, are (1) how easy it is to confuse the various terms such as "high tide line" (HTL) and "mean high water line" (MHW),

approved appellee's seawalls subject to appellee's obtaining any needed Corps permits, but they required that appellee build the seawall in fill area number 2 over the top of the riprap seawall because they were concerned about what effect the digging of footings would have on erosion.

In August 1986, having heard nothing more from the Corps, appellee assumed he needed no permit and constructed the seawall in fill area number 2. Within days, the Corps—suddenly demonstrating a promptness previously lacking—sent an official to appellee's property to inform him that the seawall in fill area number 2 probably was in violation of the Corps' permit requirements because it had been built to seaward of HTL without a permit. The official told appellee that HTL was not the same as MHW.

This was not the final chapter in this sorry saga. On September 10, 1986, the Corps sent a letter to Campbell stating that appellee's seawall was in violation of the Corps' permit requirements because "[the Corps'] jurisdiction over filling extended landward to [HTL]". The Corps never sent a copy of this letter to appellee and Campbell never told appellee that he had received it. Campbell testified that he decided not to inform appellee about the letter because he still believed that MHW and HTL were the same thing; and, since the seawall was above MHW, there was no problem and no need to tell appellee about the letter. In November 1986 appellee, having heard nothing further from the Corps about the placement of the seawall in fill area number 2, assumed that the placement was not in violation of the Corps' permit requirements. Accordingly, he completed the seawall in fill area number 3.

The Corps commenced the instant enforcement action a short time later, seeking an order requiring appellee, among other things, to demolish the seawalls and to remove from fill area number 2 the unauthorized fill seaward of HTL.[14]

## II.

Turning first to the majority's holding that the district court erred in finding that the traditional elements of estoppel are present, I disagree with my colleagues' contrary appellate finding that appellee's reliance on the Corps' statements and actions was unreasonable.

The Supreme Court has held that a party attempting to claim the benefit of estoppel must show that it relied on its adversary's conduct to such an extent that it changed its position for the worse, and the "reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Community Health Services, Inc.,* 467 U.S. 51, 59 (1984) (citing *Wilber Nat'l Bank v. United States,* 294 U.S. 120, 124–25 (1935)). I part company with the majority's assertion that appellee could not reasonably have relied on the statements and actions of the Corps. First, the district court's finding of reasonable reliance is one of fact. We must review this finding under the clearly erroneous standard and not subject the finding to the de novo review indulged by the majority. Fed.R.Civ.P. 52(a); *Nash v. Bowen,* 869 F.2d 675, 680 (2 Cir. 1989); *Krieger v. Gold Bond Bldg. Prods.,* 863 F.2d 1091, 1098 (2 Cir.1988). Second, the district court's finding that appellee's reliance on the Corps' statements and actions was reasonable was not clearly erroneous.

The correct starting point is the proper standard of review of the finding by the district court that appellee reasonably relied on the Corps' statements and actions. The majority erred in applying a de novo standard of review, since an analysis of the question to be determined—reasonable reliance—makes clear that the question is one of fact. As the Supreme Court stated

---

and (2) that no one concerned with this project seems to have known just what the Corps' jurisdiction was.

**14.** Other claims for relief sought by the government with respect to fill areas numbered 1 and 3 are not the subject of this appeal.

in *Heckler*, reliance is reasonable when "the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." 467 U.S. at 59.

While the question of what appellee knew clearly is a question of fact, the question of what appellee should have known also is a question of fact. For example, what appellee should have known is intimately related to the means he had to obtain such knowledge. *Id.* at 59–60 & n. 10 (quoting 3 Pomeroy, Equity Jurisprudence § 810, at 219 (Symons ed. 1941) (" 'If, at the time when he acted, such party had knowledge of the truth, *or had the means by which with reasonable diligence he could acquire the knowledge....*' ") (emphasis added)). Even if the determination of the means available to appellee to ascertain the Corps' jurisdiction is a finding of a subsidiary fact, the finding of what appellee should have known also is a finding of ultimate fact (derived in considerable part from the finding of this subsidiary fact). Such finding still is reviewed under the clearly erroneous standard. *Pullman–Standard v. Swint*, 456 U.S. 273, 287 (1982) ("[Rule 52(a)] does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with 'ultimate' and those that deal with 'subsidiary' facts."). Thus, a determination of the subsidiary fact of the means available to appellee to ascertain the Corps' jurisdiction, as well as the determination of the ultimate fact of what appellee should have known, clearly are findings of fact.

This same analysis applies to the ultimate finding as to whether appellee reasonably relied on the statements and actions of the Corps. Clearly, the finding of what appellee knew or should have known are findings of subsidiary facts. It follows that the determination of whether or not appellee reasonably relied on the Corps' statements and actions is a finding of ultimate fact derived from the findings of subsidiary facts. *Id.; see also National Treasury Employees Union v. Reagan*, 663 F.2d 239, 249 (D.C.Cir.1981) (determination

of detrimental reliance by members of class best suited to factfinding on an individual basis by the district court). Here, the majority erred in applying a de novo standard of review to the district court's finding that appellee reasonably relied on the Corps' statements and actions.

Applying this standard of review, I am satisfied that the district court's finding that appellee reasonably relied on the Corps' statements and actions was not clearly erroneous. Indeed, even under de novo review, the district court's finding of reasonable reliance should be affirmed. The district court based its finding on a combination of the following: Yoder's statements of the Corps' jurisdiction and placement of the riprap seawall; the Corps' silence when appellee placed the riprap seawall below HTL, when Campbell in February 1986 filed the drawings of the proposed seawalls in fill areas numbered 2 and 3, and when both appellee and Campbell tried to learn whether the Corps would exercise jurisdiction over the proposed seawalls; and the complicated regulatory scheme which left jurisdiction unclear and made it difficult for appellee independently to determine the Corps' jurisdiction.

The majority, however, has accepted the government's claim that appellee's reliance on the Corps' statements and actions was not reasonable, both because the Corps repeatedly referred in writing to HTL as the limit of its jurisdiction and because appellee had the means to learn the extent of the Corps' jurisdiction.

As set forth above in Part I of this dissent, a perusal of the correspondence between the Corps and appellee or Campbell shows several references to HTL; yet all but one merely refer to HTL in one manner or the other without relating it to the Corps' jurisdiction. The one letter in which the Corps clearly stated that its jurisdiction extended landward to HTL was written more than 4 years before appellee sought to build the seawalls in fill areas numbered 2 and 3.

The majority, like the government, also points to two conversations in which it

claims that the Corps' jurisdiction was made clear. The first of these conversations took place April 10, 1986 when appellee telephoned the Corps to determine the status of his inquiry as to whether it planned to exercise jurisdiction over the proposed seawalls. Although it is said that a Corps official told appellee that the Corps' jurisdiction extended to HTL, by this time the Corps had appellee so thoroughly confused that he thought that HTL and MHW were one and the same; this conversation was of little help to appellee. The second conversation is the mystifying exchange that occurred at the meeting of the Westport Planning and Zoning Commission set forth in note 13, *supra;* but this merely shows how widespread was the confusion over the Corps' jurisdiction. Indeed, no doubt it was the earlier, repeated vague and confusing references to the Corps' jurisdiction that caused appellee to rely on Yoder's statements and actions during her visit to appellee's lots.

Yoder's visit is of particular importance in evaluating the district court's finding of reasonable reliance. She went to appellee's property to clear up a major misunderstanding between the Corps' and appellee. It certainly was reasonable for appellee to assume that she knew the limits of the Corps' jurisdiction and was authorized to make the statements that she made. Yet, when asked about the proper placement of a seawall in fill area number 2, she erroneously stated that the Corps' jurisdiction extended landward only as far as MHW. She also approved a map drawn by appellee depicting what she stated he was permitted to do when he constructed the riprap seawall—and which when built according to this plan extended below HTL. Appellee later built the seawall in fill area number 2 over the top of the riprap seawall. When all is said and done, it is certain that what appellee truly cared about was where physically the Corps' jurisdiction ended, rather than what that line was called. In hindsight, appellee's reliance on Yoder's statements delineating that line was misguided, but it surely was not unreasonable.

Appellee's reliance on Yoder's statements also was reasonable in the light of the Corps' follow-up letter which confirmed Yoder's statements on the placing of the riprap seawall, and in the light of the Corps' silence for more than a year after the riprap seawall was built in part within the Corps' jurisdiction. The reasonableness of appellee's reliance is reflected also in the failure of the Corps over the six month period following February 1986 to answer the repeated inquiries by Campbell and appellee as to whether it would exercise jurisdiction over the proposed concrete seawalls in fill areas numbered 2 and 3.

Finally, this is not a case in which appellee had the means through reasonable diligence independently to determine the jurisdiction of the Corps. As the district court found, the Corps' CWA jurisdiction was "obscure", "subject to conceptual confusion" and "not easy to discern". 695 F.Supp. at 694–95. Indeed, a large number of people—including several Corps employees and the marine architect Campbell—were confused about the extent of the Corps' jurisdiction. If these people were confused as to the Corps' jurisdiction, it is not surprising that appellee—a man who runs an auto repair business—likewise was confused.

In short, whether one applies a clearly erroneous or de novo standard of review, the district court's finding that appellee reasonably relied on the statements and action of the Corps strikes me as eminently sensible and just. The majority's appellate finding to the contrary could have been reached only by blinding itself to the stark facts of record.

### III.

This brings me to the majority's alternative holding that the Corps' statements and actions do not rise to the level of affirmative misconduct necessary to estop the government. I recognize that it has been held that the government's affirmative misconduct must be seriously misleading if not egregious before it may be estopped. The government's misconduct here surely was seriously misleading, to put it mildly.

There is nothing that forecloses our Court from holding that the government is estopped. First, there is no absolute bar to estopping the government. Although the Supreme Court has never estopped the government, it never has stated that it would not do so if confronted with affirmative misconduct. *E.g., INS v. Miranda,* 459 U.S. 14, 17 (1982) (per curiam); *Schweiker v. Hansen,* 450 U.S. 785, 788–89 (1981) (per curiam); *INS v. Hibi,* 414 U.S. 5, 8 (1973) (per curiam); *Montana v. Kennedy,* 366 U.S. 308, 314–15 (1961).

Second, while lower court decisions holding that the government is estopped are rare, they are not unknown. Judge Newman has observed that "no fewer than eight circuits, including this one, have stated that there are some circumstances in which the Government will be estopped." *Hansen v. Harris,* 619 F.2d 942, 959 (2 Cir.1980) (Newman, J., concurring) (collecting cases), *rev'd sub nom. Schweiker v. Hansen,* 450 U.S. 785 (1981) (per curiam); *see also Watkins v. United States Army,* 875 F.2d 699, 707 n. 11 (9 Cir.1989) (en banc).

Third, there is no bar in this circuit against estopping the government. We held the government to be estopped at least once. *Corniel–Rodriguez v. INS,* 532 F.2d 301 (2 Cir.1976).[15] Although that case was limited to its facts, *id.* at 307 n. 18, it illustrates the absence of any outright prohibition against estopping the government in this circuit if the government is guilty of affirmative misconduct. *Corniel–Rodriguez* —which involved the exercise of the government's immigration authority—also implicitly rejected the view of some circuits that the government may be estopped if it has engaged in a proprietary activity, but never if it has engaged in the exercise of its sovereign powers. *E.g., Deltona Corp. v. Alexander,* 682 F.2d 888, 891–92 (11 Cir.1982) (government may not be estopped in Army Corps of Engineers permit proceedings because such proceedings constitute an exercise of sovereign powers);

*Hicks v. Harris,* 606 F.2d 65, 68–69 (5 Cir.1979).

In short, it is clear that the Corps may be estopped in this circuit if it is established that it has engaged in affirmative misconduct. The cases finding affirmative misconduct tend to have been decided on their individual facts and therefore provide little guidance on the precise nature of affirmative misconduct required. Significantly, however, there is an absence in this case of several of the policy considerations that have influenced some courts to require particularly egregious misconduct by the government before a finding of affirmative misconduct can be made.

First, one of the reasons for the Supreme Court's refusal to estop the government has been its concern that only Congress has the power to set the rules governing the granting of government benefits, which in effect permit access to the public treasury. "The Court has recognized ... 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury' ". *Schweiker, supra,* 450 U.S. at 788 (quoting *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 385 (1947)). In the instant case, however, whether or not appellee is permitted to retain his seawall has no effect on the public fisc. The Seventh Circuit has stated that the absence of concern over access to the treasury diminishes the force of the prohibition against estopping the government. *Portmann v. United States,* 674 F.2d 1155, 1163 (7 Cir. 1982). Indeed, although the Supreme Court has declined to estop the government in non-benefit cases, it appears at least to have implicitly recognized that it might be easier to estop the government in a non-benefit case than in a case involving access to public funds. *Schweiker, supra,* 450 U.S. at 789 n. 4.

The non-benefit estoppel cases decided by the Supreme Court all involved immigration and naturalization proceedings. This is an area of the law in which the Supreme

---

**15.** Also we held that the government should be estopped in *Hansen v. Harris, supra.*

Court has held that the courts owe special deference to the other branches of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("But that the formulation of [immigration] policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."). The same sort of special deference to the decisions of Congress found in cases involving access to the public fisc also is found in immigration and naturalization cases. The instant case involves neither of these unique areas of the law.[16]

Second, the Ninth Circuit has held that estopping the government may be appropriate if little or no harm to the public interest will result. *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9 Cir.1973).[17] In the instant case no damage to the public interest would result if appellee were permitted to retain the seawall in fill area number 2. The wall involves only an infinitesimal portion of the Saugatuck River shoreline. The area around appellee's property already is extensively developed and appears to have several sizable seawalls built to protect large corporate facilities. The government simply has failed to show what appreciable harm will result if appellee is permitted to retain his seawall.

Third, the prohibition against estopping the government is undercut when the government misrepresents the meaning of complex and confusing regulations. I recognize that the Supreme Court has stated that estoppel rarely is justified by a party's claim that it was misled by an agency's misinterpretation of the law, since everyone is presumed to know the law. *E.g., Heckler, supra,* 467 U.S. at 63; *Merrill, supra,* 332 U.S. at 384. Nevertheless, as both the Seventh and Ninth Circuits have stated, this adage loses much of its force

where as here the government regulations in question are complex and a party must rely on the agency's interpretation of its own confusing regulations. *Portmann, supra,* 674 F.2d at 1163; *California Pac. Bank v. Small Bus. Admin.,* 557 F.2d 218, 224 (9 Cir.1977). The policies expressed in these cases strike me as applying with particular force to the instant case. As Judge Daly observed, "[t]he law involving navigable waters ... is complicated and confusing", and the people dealing with the Corps quite naturally rely on its guidance in interpreting the regulations. 695 F.Supp. at 698.

In view of the foregoing, I would hold that the Corps' statements and actions constitute the affirmative misconduct necessary to estop the government. When one applies the lesser showing of affirmative misconduct required here to the Corps' statements and actions, estoppel of the government is especially appropriate. The instant case is significantly more egregious than the run of the mill governmental estoppel case in which a victim of a bureaucratic error tries to hold the government to a single misstatement made by an errant government employee. Rather, the instant case involves repeated bureaucratic bungling. That is why in my view the district court properly considered the Corps' misconduct in the aggregate in arriving at its eminently correct decision to estop the government.

We have here, among other things, the classic element of a misstatement by a government employee regarding a vital agency rule. But there is much more. The critical rule with which we are concerned involved a jurisdictional concept easily confused with other similar concepts. The rule was set forth in a series of murky and perplexing regulations. There simply was no person or office to which appellee could turn to obtain a simple, straightforward explanation of HTL. Appellee's confusion

---

**16.** *Corniel-Rodriguez, supra,* also involved an immigration matter. Nevertheless, we estopped the government in that case. We have shown a willingness to estop the government even in an area in which deference traditionally has been accorded to policies set by Congress.

**17.** The Ninth Circuit now requires a showing that there will be no damage to the public interest before it will estop the government. *Watkins, supra,* 875 F.2d at 707, 708.

was exacerbated by his receipt of a letter from the Corps shortly after Yoder's visit which appeared to confirm the apparent correctness of her statement to him. Moreover, when appellee acted in accordance with Yoder's misstatement and built the riprap seawall below HTL, the Corps did nothing for more than a year.

The statements and actions summarized above, however, did not constitute the whole of the Corps' misconduct. After Campbell prepared his drawings for the proposed seawalls in fill areas numbered 2 and 3, he sent them to the Corps and asked that it inform him within ten days whether the seawalls were within the Corps' jurisdiction. The Corps not only ignored this request; it failed to inform Campbell or appellee of its jurisdiction for more than six months, even though Campbell and appellee repeatedly followed up the initial inquiry. Significantly, this failure occurred despite the fact that the Corps treated the inquiry as a permit application *and was bound by its own regulations* to request any additional required information within fifteen days after receiving the inquiry and to render a decision on the application within sixty days. 33 C.F.R. §§ 325.2(a)(1), 325.2(d)(3) (1988). A quick perusal by the Corps of the drawings submitted with the inquiry would have disclosed that the proposed seawalls were to extend below HTL. If the Corps had simply obeyed its own regulations, this entire fiasco could have been avoided.

The Corps' failure to obey its own regulations and the resultant harm to appellee is particularly significant in light of *Corniel–Rodriguez, supra.* The key to the Court's estoppel in that case was the finding that the government had failed to provide an applicant for an immigrant's visa with a warning required by State Department regulations. As a result of that failure, the applicant committed an act which eliminated her eligibility for the visa. The regulation had been promulgated to protect the immigrant from precisely such a fate. We held that the government should be estopped from enforcing a statute barring the applicant's immigration on the ground that it would be unjust to enforce the statute since the State Department had violated a regulation with the force of law promulgated to prevent the immigrant from unwittingly violating the statute. *Corniel–Rodriguez, supra,* 532 F.2d at 306–07 (failure to comply with "affirmatively required procedure" designed to protect applicant was severe affirmative misconduct).

In the instant case, appellee was misled into thinking the Corps had no jurisdiction over his proposed seawall in part because the Corps failed to respond to his inquiry in a timely manner in accordance with its regulations which also have the force of law. True, the regulations in the instant case have other aims (e.g. efficient Corps management) contrasted with the sole aim of the regulation in *Corniel–Rodriguez* of protecting the applicant. Granted that *Corniel–Rodriguez* does not control the instant case,[18] it seems to me that the instant case is no weaker or less compelling than *Corniel–Rodriguez. Corniel–Rodriguez* involved a single incident of administrative failure. The instant case involves repeated and serious bureaucratic blundering.

The Corps' violation of a regulation with the force of law also distinguishes this case from *Schweiker v. Hansen, supra.* In *Hansen,* we held that the Social Security Administration (SSA) was estopped from enforcing statutes and regulations requiring an applicant for benefits to file a written application. The applicant had failed to file an application after she had been incorrectly advised that she was not eligible for certain benefits. When she later learned that she was eligible for the benefits, she filed an application to receive the benefits effective from the date of her original inquiry. The SSA denied her application for the past benefits on the ground that she had not filed a written application at the time of the original inquiry. We held that the SSA was estopped from applying the written application rule on the ground that the SSA employee who had originally informed the applicant that she was not eligible for benefits had violated an SSA man-

---

**18.** *Corniel–Rodriguez* also was limited to its facts. *Id.* at 307 n. 18.

ual requiring him to recommend that she file an application even if he thought she was not eligible for benefits. *Hansen, supra,* 619 F.2d at 947–49, *rev'd,* 450 U.S. 785 (1981).

In reversing, the Supreme Court held in part that it was not affirmative misconduct for the SSA employee to ignore the manual's instruction that he recommend that the applicant file a written application even if he thought she was not eligible for benefits. The Court stated that the manual had no legal force and did not bind the SSA. *Schweiker, supra,* 450 U.S. at 789–90. This distinguishes *Schweiker* from the instant case because the regulations which require timely processing of Corps permit applications do have the force of law. The case also is distinguishable from *Hansen* in that the affirmative misconduct in the instant case involved more than incorrect verbal advice.

For the reasons stated above, I am satisfied that the Corps is guilty of the affirmative misconduct necessary to estop the government. A Corps employee gave incorrect advice to appellee, who relied upon it to his detriment. The Corps followed up the incorrect advice with a confirming letter. Appellee built a riprap seawall in accordance with this advice within the Corps' jurisdiction. For more than a year the Corps did nothing. Appellee then sent drawings to the Corps for two proposed seawalls which clearly showed that the proposed seawalls were within the Corps' jurisdiction. He asked the Corps whether the seawalls were within its jurisdiction. The Corps ignored this inquiry as well as subsequent follow-up communications, even though its own regulations required it to give appellee a prompt response. In view of the lesser showing of affirmative misconduct required under the facts of the instant case, I would affirm the judgment of the district court and I would do so on the careful, comprehensive, well-reasoned opinion of Judge Daly. 695 F.Supp. 693.

19. *Schweiker v. Hansen, supra,* 450 U.S. at 792 (Justice Marshall dissenting).

## IV.

To summarize:

The majority erred in applying a de novo rather than the clearly erroneous standard of review to the district court's finding that appellee reasonably relied on the Corps' statements and actions in placing the seawall in fill area number 2. The majority further erred in holding that appellee's reliance was not reasonable. Finally, on the facts of this case, the Corps' conduct constituted the affirmative misconduct necessary to estop the government.

Indeed, if this record does not warrant sustaining Judge Daly's decision that the government be estopped from demolishing this landowner's seawall, then the word should go out that this circuit under no circumstances will permit the government to be estopped. This would be more honest and forthright than saying in effect that "we will know an estoppel when we see one".[19]

I would affirm the judgment of the district court on Judge Daly's opinion. From the majority's refusal to do so, I respectfully but emphatically dissent.

