**EXPORT–IMPORT BANK OF THE UNITED STATES, Plaintiff,**

v.

**ASIA PULP & PAPER CO., LTD., PT Indah Kiat Pulp & Paper TBK, PT Pabrik Kertas Tjiwi Kimia TBK and PI Pindo Deli Pulp & Paper Mills, Defendants.**

No. 03 Civ. 8554 (LTS)(JCF).

United States District Court,
S.D. New York.

Nov. 8, 2005.

---

52. *See* Fed.R.Civ.P. 23(a)(4).

55. *See* Adib Motion.

56. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

Edward Chang, U.S. Attorney's Office, Nicole L. Gueron, Sarah Elizabeth Light, U.S. Attorney, New York City, for plaintiff.

Kenneth Robert Puhala, Schonfeld & Weinstein, L.L.P., New York City, for defendant.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The defendant and the plaintiff in this action have each moved pursuant to Rule 37 of the Federal Rules of Civil Procedure for orders compelling discovery. The defendant, the Asia Pulp & Paper Company, Ltd. ("APP" or "the company"), contends, among other things, that the plaintiff has applied the deliberative process privilege improperly. The plaintiff, the Export–Import Bank of the United States ("Ex–Im" or "the agency"), objects to the defendant's use of the "functional equivalent" doctrine, which extends the attorney-client privilege to communications between a corporation's counsel and corporate consultants who are de facto employees. Ex–Im also asserts that APP forfeited its attorney-client privilege over an entire subject by discussing an attorney's advice on the subject during a deposition.

*Background*

Ex–Im brought this lawsuit against APP and its affiliates to recover funds due under several promissory notes. (Second Amended Complaint ("SAC"), ¶ 1). Organized under federal law as an agency of the United States of America, Ex–Im has a statutory mandate to promote American employment by aiding in the financing of purchases by overseas buyers of American goods. 12 U.S.C. § 635(a)(1). The agency does this by offering several kinds of financial products, including loan guarantees. (SAC, ¶ 10). The credit extended in this case involved loan guarantees to various commercial banks and financial institutions that financed purchases of American products by APP and its affiliated companies. (SAC, ¶¶ 12, 17).

APP, a Singapore corporation, together with its related companies in Indonesia, constitutes one of the largest paper manufacturers in the world. (SAC, ¶¶ 5–8, 18). In March 2001, APP and its affiliates, with worldwide debts approaching $14 billion, announced a decision to stop servicing all of APP's loans and to seek an out-of-court negotiated restructuring of its international debt. (Declaration of Ferry Siswojo Djongianto in Opposition to Plaintiff's Motion to Compel Disclosure ("Ferry Decl."), ¶ 4). This triggered close to three years of intensive negotiations between APP and its creditors, including Ex–Im and the Indonesia Bank Restructuring Agency ("IBRA"), an agency of the Indonesian government. (Declaration of Kenneth R. Puhala in Support of Defendant's Motion to Compel and Certification of Good Faith ("Puhala Decl."), ¶¶ 5, 6). In October 2003, Ex–Im withdrew from the negotiations and filed suit to collect on APP's indebtedness. (Puhala Decl., ¶¶ 5, 6).

APP raises the affirmative defense of equitable estoppel, which forms a principal basis for its discovery requests. The company contends that Ex–Im is estopped from asserting its claims because the agency actively negotiated with APP and obtained onerous concessions by leading APP to believe that it would sign the restructuring agreement. (Puhala Decl., ¶ 7).

Document production to date has been extensive. APP has produced in excess of 90,-000 documents and a 450–page privilege log. (Puhala Decl., ¶ 8; Declaration of AUSA Nicole Gueron in Support of Plaintiff's Motion to Compel ("Gueron Decl."), Exh. E). The log lists approximately 6,500 documents, all described as shielded by either the attorney-client privilege, work product immunity, or both. (Gueron Decl., Exh. E). A number of entries list as recipients of privileged documents Nicky Tan, a financial consultant who was engaged by APP to help the company restructure its debt, or employees of Mr. Tan's consulting business. (Gueron Decl., Exh. E).

Ex–Im has produced roughly 190,000 pages of documents (Declaration of AUSA Sarah Light in Support of Plaintiff's Opposition to Defendant's Motion to Compel ("Light Decl."), ¶ 3), and a 1,100–page privilege log. (Puhala Dec., Exh. F). Ex–Im claims the attorney-client privilege, work product immunity, or a combination of the two over a great preponderance of documents listed in its privilege log. Approximately 500 documents are identified as protected solely by the deli-

berative process privilege. (Puhala Decl., Exh. F; Declaration of James K. Hess, Chief Financial Officer, U.S. Export–Import Bank ("Hess Decl."), Att. A (extracting and listing the deliberative process privilege documents separately)).

In response to APP complaints, Ex–Im has expanded its descriptions of the deliberative process documents in its privilege log, elaborating upon what had been brief phrases such as "status report," "draft document," and "draft correspondence." (Puhala Decl., Exh. D, at 5; Light Decl., Exh. I, at 2). The new entries give more specific information. However, Ex–Im has not altered entries describing documents protected by attorney-client and work product privileges, and many of those are merely two- or three-word phrases.

The parties have deposed a number of witnesses. APP conducted a deposition of a former Ex–Im employee, Reyhana Mostofi, in May 2005 in Hong Kong, reserving a right to seek a reopening of the deposition. (Letter of Kenneth R. Puhala dated May 15, 2005, attached as Exh. L to Puhala Decl.). Ex–Im has deposed six APP witnesses, including Bertie Mehigan, a partner at White & Case who served as an advisor to APP during the restructuring process. During the deposition, Mr. Mehigan, who testified as a designated representative of APP, discussed his advice to APP to abstain from making a $90 million payment to IBRA, despite alleged pressure from Ex–Im to make the payment (Gueron Decl., Exh L at 15–17), and despite APP's $1 billion debt to IBRA.

In November 2004, APP served a subpoena on the United States Department of State ("the State Department") seeking testimony and all documents relating to APP over a period stretching from January 2001 to December 2004. (Nov. 22, 2004 Subpoena; Letter of Benjamin P. Deutsch dated Nov. 16, 2004, attached as Exhs. B and C, respectively, to Declaration of Sarah E. Light in Support of Specially Appearing Non–Party State Department's Opposition to Defendant's Motion to Compel dated June 7, 2005 ("Light Decl. II")). In response to the subpoena, the State Department produced a red-weld containing documents, a privilege log listing 184 documents, and a letter addressed to APP counsel from James Thessin, Acting Legal Advisor to the State Department. Mr. Thessin expressed his conclusion that production of documents sought by APP is governed by 22 C.F.R. part 172, which grants the State Department discretion to determine whether it should produce requested documents. (Puhala Decl., ¶ 21; Light Decl. II, Exh. E).

All of this discovery had given rise to an assortment of challenges by each party. I will address each party's motion in turn.

*Discussion*

### A. *Defendant's Motion to Compel*

APP seeks an order compelling Ex–Im to produce documents withheld based on the deliberative process privilege; to cure deficiencies in its privilege log, either by producing all documents or revising the log; and to reopen the deposition of Ms. Mostofi. It also seeks to compel the State Department to produce a sworn statement justifying its invocation of the deliberative process privilege.

For the reasons discussed below, the application for an order seeking documents withheld on the basis of the deliberative process privilege is denied; the request for an order compelling Ex–Im to revise its privilege log is granted; the request for an order to reopen Ms. Mostofi's deposition at Ex–Im's expense is denied; and the application for an order compelling a statement from the State Department is denied.

### 1. *The Deliberative Process Privilege*

APP argues that Ex–Im has swept too many documents under the protective umbrella of the deliberative process privilege and that, in all events, the agency has failed to give precise and certain reasons for invoking the privilege.

The deliberative process privilege shields from disclosure "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and polices are formulated.'" *NLRB v. Sears, Roebuck Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1984) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324

(D.D.C.1966)); *see Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 8–9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001); *In re Sealed Case*, 121 F.3d 729, 737 (D.C.Cir.1997); *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir.1999). The rationale for the privilege is that it helps the public obtain the best possible policies by promoting "free expression, integrity, and independence of those responsible for making the determinations which enable the government to operate." *United States v. Hooker Chemicals & Plastics Corp.*, 114 F.R.D. 100, 102 (W.D.N.Y.1987) (citations omitted); *see also In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577, 580–82 (E.D.N.Y.1979). To qualify for the privilege, the government must show that the document to be protected is both "predecisional" and "deliberative," *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir.1999), and must explain its decision to withhold documents with "precise and certain" reasons. *Resolution Trust Corp. v. Diamond*, 773 F.Supp. 597, 604 (S.D.N.Y. 1991).

■ The privilege is a qualified privilege, "a discretionary one that depends upon *ad hoc* considerations of competing policy claims." *Franklin National Bank*, 478 F.Supp. at 582 (citations omitted). The competing interests weighing against the privilege include, foremost, the public's interest in accurate judicial decision-making. *Id.* To determine whether a government agency's claim of the privilege is justified, courts consider a number of factors, including the relevance of the evidence the agency seeks to protect, the availability of other evidence, the seriousness of the litigation, the role of the agency in the litigation, and the possibility that disclosure will inhibit candid debate among agency decision-makers. *Id.* at 583; *accord United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 165 (E.D.N.Y.1994); *Resolution Trust Corp.*, 773 F.Supp. at 605; *Hooker Chemicals & Plastics*, 114 F.R.D. at 102. In conducting this balancing test, courts must weigh with great care the potential value of the evidence sought by the litigant. *Franklin National Bank*, 478 F.Supp. at 582.

■ APP's argument fails at the threshold of this analysis because the evidence it seeks lacks relevance. APP's "main defense to [this] lawsuit and the principal subject of discovery in this case is whether Ex–Im is estopped or otherwise equitably prevented from asserting its claims." (Puhala Decl., ¶ 7). APP's assertion of the defense, however, is futile, and thus, the evidence it seeks has no relevance at all.

■ Two factors make APP's estoppel defense fruitless. First, it is asserted against the government. "The doctrine of equitable estoppel is not available against the government except in the most serious of circumstances and is applied with the utmost caution and restraint." *Drozd v. INS*, 155 F.3d 81, 90 (2d Cir.1998)(internal quotation marks and citations omitted); *see also City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir. 1994); *United States v. Boccanfuso*, 882 F.2d 666, 669 (2d Cir.1989); *United States v. Cyprus Amax Minerals Company*, No. 92 Civ. 290, 1998 WL 698500, at *1 (D.Conn. Sept. 16, 1998).

■ Courts apply estoppel against the government only in those limited circumstances where the defendant can establish government misconduct. *Shalala*, 34 F.3d at 1168. *See also Cyprus Amax Minerals*, 1998 WL 698500, at *1 ("The acts or conduct relied upon must go beyond mere negligence."). The conduct APP alleges—Ex-Im representing that it would sign a restructuring agreement and using its influence over the entire restructuring process to demand and extract significant concessions from APP—is hardly egregious. *See 80 Nassau Associates v. Crossland Federal Savings Bank*, 169 B.R. 832 (1994) (creditor did not engage in misconduct when it extracted payment concessions from debtor and then withdrew from negotiations).

■ Second, "a party cannot assert estoppel ... as a result of being 'induced' to do what he is already legally required to do." *Id.* at 842. The case of *80 Nassau Associates* is instructive. There, debtors sought an order subordinating one bank's secured claims to the claims of all other creditors.

*Id.* at 835. The basis of the debtors' motion was a charge that the bank had engaged in inequitable conduct: the bank's repeated assurance that it would restructure the debt if the debtors paid their obligations lulled the debtors' into making tax payments; then, at the eleventh hour, instead of negotiating a restructuring of the debt, the bank filed a foreclosure action. *Id.* at 835–36. The court rejected the estoppel claim, holding that, as a matter of law, debtors cannot be lulled into paying expenses they are independently obligated to pay. *Id.* at 842.

APP's effort to estop Ex–Im suffers from the same infirmity as the debtors' efforts in *80 Nassau Associates.* APP may have devised alternate ways to restructure its debt in the absence of Ex–Im's entreaties. However, it was APP's debts, not Ex–Im's entreaties, that obligated APP to make the payments it made to its creditors.

■ As a matter of law, APP fails to set forth an estoppel claim against the government, and thus fails to demonstrate that the government's documents have relevance. Nor do other factors tip the balance in APP's favor. Courts weighing the government's need to protect communications against the public's interest in accurate fact-finding also consider the availability of other evidence, the seriousness of the litigation, the government's role in the litigation, and the chilling effect disclosure might have upon future policymakers.

With regard to the availability of other evidence, APP has access to its own principals who can answer whether Ex–Im's representations caused APP to change position, as well as to hundreds of thousands of pages of Ex–Im documents that have already been produced. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 327–28 (D.D.C.1966) (argument for forcing disclosure unavailing where adverse party fails to show that thousands of pages already furnished do not contain information sought).

The need for full disclosure is not increased by the seriousness of this litigation. Courts that have cited the seriousness of an action as a factor in ordering disclosure have noted the importance of the public policies involved and the public's need to know how effectively government is working. *See Resolution Trust Corp.,* 773 F.Supp. at 605 (seriousness weighs in favor of disclosure where litigation implicates state and federal policies that would effect living conditions of thousands of New York City tenants). An insider's look at the process of restructuring a debt, a process that requires business and financial decisions, does not implicate the effectiveness of public policies to the same extent.

Similarly, the role of the government in this case does not tip the balance in favor of APP. APP argues that the deliberative process privilege is not available to the government when the government is the plaintiff (Defendant's Memorandum of Law in Support of Motion to Compel Disclosure at 11) (citing *United States v. Ernstoff,* 183 F.R.D. 148, 152 (D.N.J.1998); *FDIC v. Hatziyannis,* 180 F.R.D. 292, 293 (D.Md.1998)), but that proposition is not the law in this circuit, *see Hooker Chemicals & Plastics,* 114 F.R.D. at 102 ("[T]he state does not waive its right to withhold privileged deliberative documents simply because it is a plaintiff in a given action."), and, in any event, has no logical foundation.

Finally, the risk that disclosure here will inhibit frank discussion in the future among the agency's officers is sufficient to tip the balance against APP. Ex–Im has provided declarations of its current acting financial officer and its previous chief financial officer, both of whom contend that disclosing the agency's internal deliberations would have the result of stilling communications necessary to conducting high-level financial transactions. The agency, they point out, is repeatedly involved in restructuring efforts around the globe, and Ex–Im staff would act to protect the agency's effectiveness as a negotiator by limiting non-confidential written communications within the agency. (Hess Decl., ¶¶ 9, 10; Declaration of Michael J. Discensa, Jr., Acting Chief Financial Officer, U.S. Export–Import Bank ("Discenza Decl."), ¶¶ 9, 10). I have no reason to discredit this assessment.

As none of these factors tilt in APP's favor, its request for an order compelling disclosure

of Ex–Im's privileged deliberative communications is denied.

### 2. *Deficiencies in the Privilege Log*

 Ex–Im's privilege log is a 1,100 page document listing over 11,000 documents. For the vast majority of documents, Ex–Im rests its privilege claims on assertions of the attorney-client and work product privileges. Descriptions of the documents are bare-boned. "Draft correspondence," "agenda," and "e-mail regarding draft correspondence," are typical entries in the column of the privilege log that Ex–Im has reserved for indicating the relationship of the document to legal representation. (Puhula Decl., Exh. F). Some entries are undated, fail to identify the author of the document, provide only the name of a law firm, or fail to identify recipients of the document. The log is inadequate.[1]

██ Under the Federal Rules of Civil Procedure a party withholding documents on the basis of an asserted privilege must describe the nature of the documents with enough detail "to enable other parties to assess the applicability of the privilege." Fed.R.Civ.P. 26(b)(5). At the very least, the party claiming the attorney-client privilege must give evidence that the document "was created for the purpose of providing or obtaining legal rather than business advice." *NextG Networks of N.Y., Inc. v. City of New York*, No. 03 Civ. 9672, 2005 WL 857433, at *2 (S.D.N.Y. April 13, 2005); *see also United States v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996) (descriptions lacking details to support privilege claim are inadequate); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474 (2d Cir.1993)(privilege log must give sufficient detail "to permit a judgment as to whether the document is at least potentially protected from disclosure"); *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Civ. 4978 2002 WL 31385824, at *5 (S.D.N.Y. Oct. 21, 2002)(information must be sufficient to permit party challenging privilege to state grounds of its challenge).

Ex–Im's skeletal entries leave APP and the Court "to guess at the nature of what is being withheld and why." *A.I.A. Holdings*, 2002 WL 31385824, at *5. "Draft correspondence," for example, could be letters about financial matters that bear no relation to legal advice. Ex–Im has demonstrated that it knows how to cure a sketchy privilege log: in response to APP's objections to its descriptions of deliberative process documents Ex–Im produced more detailed entries. Ex–Im must do the same for the rest of its documents.

Accordingly, Ex–Im is ordered to promulgate a revised privilege log that identifies each document with as much specificity as is needed to demonstrate that the communication was made for the purpose of obtaining or providing legal services and that the communication was intended to be and was kept confidential, where attorney-client privilege is claimed, or was prepared to assist in anticipated or ongoing litigation, where work product immunity is claimed.

### 3. *Rehane Mostofi's Deposition*

██ APP deposed a former Ex–Im employee, Reyhane Mostofi, in Hong Kong in May 2005. During the course of the deposition, Ex–Im's lawyer, Assistant United States Attorney Sarah Light, raised objections to a number of APP's questions on the basis of the attorney-client and deliberative process privileges. (Light Decl., Exh. D at 11–16, 43, 48–49, 57–58, 96, 194–96, 207, 212).

APP seeks an order allowing it to continue the deposition of Ms. Mostofi at Ex–Im's expense. Ms. Mostofi is a former Ex–Im employee living in Hong Kong. APP's rationale for reopening the deposition is not persuasive. APP argues that Ex–Im prevented APP from obtaining information from Ms. Mostofi by objecting to APP's questions. As discussed above, Ex–Im had a good faith basis for its objections: APP is not entitled to information Ex–Im withheld on the basis of the deliberative process privilege; nor is it

---

**1.** To be sure, some documents may simply be undated or fail to identify the recipient or other relevant indicia. In such circumstances, however- er, the producing party is required to provide additional information that corroborates the claim of privilege.

entitled to information Ex–Im withheld on the basis of the attorney-client privilege.

 APP contends that Ms. Mostofi's communications with Ex–Im lawyers were not covered by the attorney-client privilege because Ms. Mostofi was a former employee of the agency at the time the conversations took place. Virtually all courts hold that communications between company counsel and former company employees are privileged if they concern information obtained during the course of employment. *Surles v. Air France*, No. 00 Civ. 5004, 2001 WL 815522, at *6 (S.D.N.Y. July 19, 2001)(gathering cases and noting that the "vast majority of federal cases" so hold). It is true, as APP contends, that the privilege guarding such discussions will not protect pre-deposition conversations that are held to refresh a deponent's memory. *See Wade Williams Distribution, Inc. v. American Broadcasting Companies, Inc.*, No. 00 Civ. 5002, 2004 WL 1487702, at *1 (S.D.N.Y. June 30, 2004). However, this is a very narrow exception. Pre-deposition conversations may also be work product; to the extent Ex–Im's attorneys communicated their legal opinions and theories of the case, their conversations are immune from discovery. *Peralta v. Cendant Corp.*, 190 F.R.D. 38, 42 (D.Conn.1999)(holding that deposition questions to an ex-employee regarding conversations with employer's counsel were protected by work product immunity); *see also Morales v. United States*, No. 94 Civ. 4865, 94 Civ. 8773, 1997 WL 223080, at *1 (S.D.N.Y. May 5, 1997) (applying the work product doctrine to deposition questions to non-party witnesses); *In re Gulf Oil/Cities Service Tender Offer Litigation*, Nos. 82 Civ. 5253, 87 Civ. 8982, 1990 WL 108352, at *3 (S.D.N.Y. July 20, 1990) (same).

Under Rule 30(a)(2)(B) of the Federal Rules of Civil Procedure, "[a] party must obtain leave of the court . . . [whenever] the person to be examined has already been deposed in the case." Courts are to be guided by the standards set forth in Rule 26(b)(2) of the Federal Rules, which requires, among other things, that the court limit discovery where "the party seeking discovery has had ample opportunity . . . to obtain the information sought," or "the burden or expense of the proposed discovery outweighs its likely benefit."

APP has had its opportunity to obtain from Ms. Mostofi the non-privileged information to which it is entitled. The benefit that might be obtained from asking Ms. Mostofi about communications with Ex–Im lawyers that neither concerned information she learned while she was an Ex–Im employee nor was work product is outweighed by the burden a new deposition would impose on Ex–Im.

### 4. The State Department's Deliberative Process Privilege

 APP's final request is for an order requiring the State Department to produce a sworn statement by a senior official justifying its invocation of the deliberative process privilege. This request is denied. Documents disclosing the internal deliberations and opinions of the State Department staff have no more relevance to APP than deliberative documents prepared by Ex–Im's staff, which is negligible in light of the futility of APP's equitable defense.

### B. Plaintiff's Motion to Compel

Ex–Im seeks two categories of documents from APP: those shared with APP's financial advisors, principally Nicky Tan and the employees of Mr. Tan's consulting business, nTan, and those that relate to APP's $90 million payment to IBRA, the Indonesian Bank Restructuring Agency. Ex–Im's request for documents relating to the $90 million dollar payment is denied; its request for documents APP shared with Mr. Tan and other financial advisors is granted.

### 1. Documents Shared with APP's Financial Advisors

APP's privilege log shows that financial advisor Nicky Tan and members of his consulting firm regularly participated in communications between APP and the company's lawyers. The company now asserts attorney-client privilege over those communications. By its own description, APP engaged Mr. Tan and his firm to lead APP through

the debt restructuring process. (Ferry Decl., ¶ 5). Mr. Tan occupied a broad role that reflected a considerable degree of responsibility. The company itself did not have management level personnel with restructuring experience, so it engaged Mr. Tan as an independent contractor to negotiate on behalf of APP, to help formulate the company's financial strategies, and to articulate APP positions to the creditor community. (Ferry Decl., ¶¶ 5–7).

 APP relies upon two doctrines to protect the attorney-client communications that included Mr. Tan and his associates. First, the company claims the communications are privileged because Mr. Tan's participation helped APP's lawyers understand the complicated accounting principles undergirding the restructuring of the company's massive debt. Under *United States v. Kovel,* 296 F.2d 918, 922 (2d Cir.1961), communications with a financial advisor are covered by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer.

If this were APP's only argument, Ex–Im's request could be granted without further analysis: Mr. Tan was by the company's own reckoning a major participant in APP's financial affairs, not a mere interpreter. *See id.* at 922 (no privilege exists if advice sought is financial, not legal); *see also United States v. Ackert,* 169 F.3d 136, 139 (2d Cir.1999) (it is not sufficient to trigger privilege that communication proves important to lawyer's ability to represent client); *United States v. Adlman,* 68 F.3d 1495, 1500 (2d Cir.1995)(no privilege exists to protect lawyer's consultation with client's tax advisor where advice sought was on tax implications of proposed transaction).

 However, APP invokes a second doctrine that presents a closer question. The company argues that Mr. Tan was so thoroughly integrated into APP's corporate structure that he should be treated as though he were a corporate employee for privilege purposes. Under a doctrine adopted by the Eighth Circuit Court of Appeals and some district courts in the Second Circuit, communications between a company's lawyers and

its independent contractor merit protection if, by virtue of assuming the functions and duties of full-time employee, the contractor is a *de facto* employee of the company. *See In re Bieter Co.,* 16 F.3d 929, 936–37 (8th Cir. 1994); *In re Copper Market Antitrust Litigation,* 200 F.R.D. 213, 218–19 (S.D.N.Y. 2001); *Ross v. UKI Ltd.,* No. 02 Civ. 9297, 2004 WL 67221, at *4 (S.D.N.Y. Jan. 15, 2004); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,* No. 01 Civ. 3016, 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002).

 To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, *In re Bieter,* 16 F.3d at 933–34; *Ross,* 2004 WL 67221, at *4, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, *In re Bieter,* 16 F.3d at 938; *In re Copper Market,* 200 F.R.D. at 219; *Ross,* 2004 WL 67221, at *4, and whether the consultant is likely to possess information possessed by no one else at the company, *In re Bieter,* 16 F.3d at 938.

 APP has the burden of showing that Mr. Tan and his associates meet this standard of integration into the APP corporate structure, *see Bowne,* 150 F.R.D. at 470 (S.D.N.Y.1993) (the burden of proving elements of privilege rests on the party claiming the privilege), and it has failed to meet this burden. APP has demonstrated that Nicky Tan was intimately involved in APP's restructuring talks, yet Mr. Tan's efforts are precisely those that any financial consultant would likely make under the circumstances. APP reports that the company provided Mr. Tan with an office in its Jakarta, Indonesia, premises on the same floor as APP executives, but, notably, the company does not assert that Mr. Tan or any of his associates ever used the office. In fact, as Mr. Tan testified at his deposition, his office was in Singapore. (Gueron Decl., Exh. I at 8). Mr. Tan stated that during the most intense months of negotiations with APP's creditors he spent eighty to eighty-five percent of his

time on the restructuring deal, yet there were times he was free enough of his APP obligations to start and build a successful consulting business. (Gueron Decl., Exh. I at 13). Mr. Tan's schedule, the location of his head offices, and the success of his consulting business all contradict the picture of Mr. Tan as so fully integrated into the APP hierarchy as to be a *de facto* employee of APP. Possibly Mr. Tan was able to do both—run his company and function as an APP employee—but it was APP's job to prove that he did, and APP has failed to do so.

■ The attorney-client privilege should not be expanded without considerable caution because the privilege "stands in derogation of the public's 'right to every man's evidence.'" *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.1973)(quoting 8 Wigmore, Evidence § 2192 (McNaughton rev.1961), at 70). Caution is especially apt here because companies in financial crisis will often find it necessary to obtain the services of outside financial experts. If the functional equivalent doctrine were extended to every situation where a financial consultant worked exhaustively to guide a company through a restructuring deal, the exception would swallow the basic rule, set forth in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), that there is no privilege protecting communications between clients and their accountants.

### 2. Documents Pertaining to APP's $90 Million Payment to IBRA

■ Ex–Im seeks all documents that relate to APP's $90 million payment to IBRA. Ex–Im claims that APP waived its attorney-client privilege over documents pertaining to the payment when APP's outside counsel, testifying at a deposition as an APP representative, voluntarily disclosed that he advised APP against making the payment. In an effort to demonstrate Ex–Im's inequitable control over the restructuring process, APP's outside counsel, Bertie Mehigan, a law partner at White & Case, testified that he advised APP against making the payment, despite Ex–Im pressure. (Gueron Decl., Exh. L at 16:13–17:21). Ex–Im contends that Mr. Mehigan's testimony constitutes a

subject matter waiver. Subject matter waiver rests on the principle that a party may not use the attorney-client privilege as both a sword and a shield. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.); *In re von Bulow*, 828 F.2d 94, 103 (2d Cir.1987) (citations omitted). The waiver aims to prevent prejudice to a party that may arise when a "privilege holder releases only communications or portions of communications favorable to his litigating position, while withholding any unfavorable ones." *Bowne*, 150 F.R.D. at 484 (citing *In re Bulow*, 828 F.2d at 102). "The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is [therefore] a waiver as to all other communications to the attorney on the same matter." *In re Shearman & Sterling*, Nos. 2–124, M8–85, C84–3894, and C84–743, 1986 WL 6157, at *1 (S.D.N.Y. May 30, 1986) (quoting 8 Wigmore, Evidence § 2327 (McNaughton rev.1961)). Because "[n]otions of fairness underlie the principle of subject matter waiver," *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 Civ. 6876, 1995 WL 598971, at *6 (S.D.N.Y. Oct. 11, 1995), courts make determinations on a case-by-case basis, taking into account, among other things, whether a party's disclosure was demonstrably prejudicial to the other party. *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir.2000).

Here, Ex–Im contends that Mr. Mehigan's disclosure of his advice to APP—to refrain from making a $90 million payment—prejudices Ex–Im: it advances APP's equitable defense that APP made payments in sole reliance on Ex–Im's participation on the restructuring agreement. Ex–Im argues that it should be able to learn whether APP's lawyers ever gave the advice that paying the $90 million debt was in APP's interest.

Under the circumstances of this case, however, Ex–Im is not entitled this because APP's equitable defense is fruitless, as discussed above, and Ex–Im's disadvantage is therefore illusory. For this reason, Ex–Im's application to compel production of documents related to APP's payment of $90 million to IBRA is denied.

*Conclusion*

APP's motion to compel is granted to the extent that Ex–Im is ordered to produce a revised privilege log. To permit Ex–Im's lawyers time to revise the log, and APP's lawyers to review it, the current November 30, 2005, deadline for submission of a pretrial order is extended to January 30, 2006. APP's motion to compel is otherwise denied.

Ex–Im's motion to compel is granted to the extent that APP is ordered to disclose the documents it shared with Mr. Tan and other financial advisors. Ex–Im's motion to compel is otherwise denied.

SO ORDERED.