IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 19, 2018 Session

## WASTE ADMINISTRATIVE SERVICES, INC. v. THE KRYSTAL COMPANY, ET AL.

Appeal from the Circuit Court for Knox County
No. 2-259-15      William T. Ailor, Judge

No. E2017-01094-COA-R9-CV

We granted the Rule 9 application for an interlocutory appeal filed by The Krystal Company ("Krystal") to consider whether certain communications between Krystal's chief legal officer and David Jungling ("Jungling"), an employee of Krystal vendor Denali Sourcing Services, Inc. ("Denali"), are protected by attorney-client privilege. Waste Administrative Services, Inc. ("WASI"), which provided refuse service for Krystal, sued Krystal, Denali, and Jungling in the Circuit Court for Knox County ("the Trial Court") alleging that Krystal breached their contract by unilaterally terminating it and that Denali and Jungling induced the breach. The Trial Court held that communications between Jungling and Krystal's chief legal officer after June 9, 2014— at which time Krystal and Denali executed a master agreement—are protected by attorney-client privilege while prior communications are not. We hold that Jungling was the functional equivalent of a Krystal employee as of October 31, 2013 when he was told by Krystal's President to "take lead" on Krystal's dealings with WASI, and that his subsequent communications with Krystal's chief legal officer qualify for attorney-client privilege belonging to Krystal. We, therefore, modify the judgment of the Trial Court and remand this case for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Harry J. Winograd and Jessica J. Wood, Atlanta, Georgia, and Jeffrey R. Thompson, Knoxville, Tennessee, for the appellant, The Krystal Company.

W. Morris Kizer, Knoxville, Tennessee, for the appellee, Waste Administrative Services, Inc.

E. Michael Brezina, III and Lyndsey L. Lee, Knoxville, Tennessee, for the appellees, Denali Sourcing Services, Inc. and David Jungling.

**OPINION**

**Background**

WASI provided waste management services for Krystal, a fast food company, for a number of years dating back to 2008 under a contract between WASI and Krystal. By 2012, Krystal began dealings with Denali, a company that assists corporations in finding ways to save money. Krystal was interested in pursuing what other waste management options might be available. Krystal turned to Denali for help.

On September 12, 2012, Krystal and Denali entered into a Statement of Work. Pursuant to the 2012 Statement of Work, Denali was to provide "ad-hoc Procurement services to support Purchaser . . ." and Denali's program manager would serve as the "day to day liaison." The 2012 Statement of Work covered four identified sourcing projects: 1) Bags, Boxes, Trays; 2) Bowls, Cups, Plates; 3) Cheese; and 4) Coffee/Tea. It also contained this provision: "Any Procurement projects not covered in the scope of this agreement may be submitted to Seller via email."

On July 18, 2013, Krystal and Denali executed an amendment to Exhibit C. This amendment expanded the areas of involvement for Denali to: 1) Potatoes; 2) Beef; 3) Logistics; 4) Restaurant MRO (maintenance, repair and office supplies); and 5) Bacon/Sausage. The 2013 amendment included the following language, as well: "Purchaser and Seller are contractors independent of one another. Nothing in these Terms is intended to or will constitute either party as an agent, legal representative, or partner of the other for any purpose;" and, "[t]hese Terms shall not be amended without the written agreement of both parties."

Jungling became Denali's point man for Krystal. Jungling's emails contained this signature bloc: "David Jungling, Program Management Denali Sourcing Services on behalf of The Krystal Company." Although Jungling was a Denali rather than a Krystal employee, he took an increasingly central role in Krystal's policy with respect to WASI. This was so even though the written agreements specified no such role for Denali or Jungling. A series of emails illustrates how closely Jungling worked with Krystal leadership concerning WASI.

On October 31, 2013, Jungling sent an email to Doug Pendergast ("Pendergast"), President and CEO of Krystal, and Brian Blosser ("Blosser"), Vice-President for Development & Construction, stating:

If we want to leverage the incumbent (WASI), it may be helpful to review a list of pricing per site from WASI. I could get a comparison from other bids we've done recently and get a picture of what is possible. I think then Brian and I could have a discussion with the vendor with the request to lower the pricing to perhaps a more desired market pricing. Can we get a list of pricing per location?

Pendergast, in an email to Jungling and Blosser, stated: "David — can you and Brian take lead on this?" The next day, Jungling was included on an internal use only email. Jungling proceeded to interact with WASI on Krystal's behalf. On November 21, 2013, Blosser emailed Jungling to say: "I would like to move away from these folks [WASI] asap (if we are not obligated). They are clearly out for themselves and in no way want to provide us an experience." Jungling emailed Blosser: "No. I read the contract and don't see any language that limits Krystal other than a 90 day out clause. We would issue that clause as soon as the new vendor is selected as it may take up to 3 months to transfer the vendor." On November 25, 2013, emails at the root of this appeal were exchanged between Jungling and Krystal's chief legal officer. These emails are redacted in the record. In a January 23, 2014 email, Pendergast thanked Jungling for "staying on top of this process." Finally, on April 30, 2014, Jungling notified WASI by email that Krystal would be transitioning its refuse business to another provider.

In May 2014, Krystal and Denali signed a master services agreement expanding those areas in which Denali was authorized to act for Krystal. A new, more open-ended provision stated Denali was to "provide ad-hoc sourcing services to support [Krystal] . . . to all [Krystal] functions as directed by [Krystal]." On July 25, 2014, Krystal and Denali executed an amendment to the May 2014 agreement establishing the latter's effective date as June 9, 2014.

In May 2015, WASI sued Krystal for improper unilateral termination of their contract. WASI also sued Denali and Jungling for inducement to breach, seeking treble damages pursuant to Tenn. Code Ann. § 47-50-109. After some additional procedural history, the Trial Court considered whether certain email communications between Jungling/Denali and Krystal's chief legal officer were discoverable. Krystal asserted that Jungling was the functional equivalent of one of their employees and that he and Denali should be prevented from revealing the communications on account of attorney-client privilege. On May 22, 2017, the Trial Court entered an order holding that attorney-client privilege would attach only to those qualifying communications that occurred after June 9, 2014, the effective date of Krystal's and Denali's master agreement. The Trial Court stated:

-3-

This cause came on for hearing on the 18th day of April, 2016, upon the Krystal Company's Motion to Reconsider the Court's March 2, 2017 Order. After considering the Motion, reviewing the file and hearing the arguments of counsel for all parties, the Court rendered its opinion from the bench. From all of which, the Court finds as follows:

1. On April 14, 2016, the Court GRANTED Krystal Company's Renewed Motion for Protective Order, holding that "Mr. Jungling was the functional equivalent of an employee of Krystal, and therefore those communications [between Krystal's Chief Legal Officer and Denali/Jungling] would be privileged." (Apr. 14, 2016 Transcript, p. 20, attached hereto as **Exhibit A**.)

2. After a further review of the record and the 2012 and 2013 Statements of Work which the Court did not have previously, this Court on March 2, 2017 ruled that "any communications prior to May 15, 2014 between Jungling and Krystal would not be covered by the attorney-client privilege and that he was not the functional equivalent of an employee during those times and those communications are discoverable." *See* March 2, 2017 Order, p. 2-3

3. On April 18, 2017, the Court heard Krystal's Motion to Reconsider, all of the arguments of all counsel and reviewed the responses of the other parties as well as a further review of the exhibits filed with the Court including the 2012 and 2013 Statements of Work (SOW) entered into between Krystal (Purchaser) and Denali (Seller). The Court notes that both Statements of Work contain nothing about Denali/Jungling having the authority to terminate contracts and they are by their own terms for the limited purposes of finding information for Krystal about pricing limited to certain specifically designated areas of service none of which includes waste services. Additionally, the Court finds that the 2013 SOW states that "Purchaser and Seller are contractors independent of one another. Nothing in these Terms is intended to or will constitute either party as an agent, legal representative, or partner of the other for any purpose". (2013 SOW p.44) Other terms of the SOW designate Denali/Jungling as "program manager". In a section titled, Seller Roles and Responsibilities-Program Manager, the SOW states on p. 24 states, "The Program Manager will act as the day to day liaison **between Purchaser and Seller".** (Emphasis Added) The Court ruled that to expand the terms of the agreement between Krystal and Denali would be the equivalent of the Court rewriting the contract between the parties and any ambiguity of the same should be construed against the drawer of the agreement which in this case is Krystal.

4. As a result of everything the Court reviewed and consideration of the arguments presented, this Court held that "Mr. Jungling was not the

-4-

functional equivalent of an employee until the June 9, 2014 agreement and he did not have any authority to work on the refuse issue until that time. Therefore, the Court rules that the June 9, 2014 date is the date designating Mr. Jungling as a functional equivalent of an employee for Krystal." (Apr. 18, 2017 Transcript, p. 40, attached hereto as **Exhibit B**)  As a result, KRYSTAL000046-50 and 56-59, dated prior to June 9, 2014 are not protected by any attorney-client privilege.  However, KRYSTAL 000053-55 dated after June 9, 2014, are protected by attorney-client privilege. (see **Exhibit C** consisting of redacted versions of documents filed with the March 27, 2016 Notice of Filing Documents Under Seal).

IT IS THEREFORE ORDERED that Krystal's Motion to Reconsider is DENIED and any communications prior to June 9, 2014 between Jungling and Krystal are discoverable and shall be produced. However, this issue is approved for interlocutory appeal, and no production of the documents at issue shall occur until after all appeals are exhausted. (Apr. 18, 2017 Transcript, p 55, attached hereto as **Exhibit D**)

The Trial Court granted permission for interlocutory appeal as did this Court.

## Discussion

We granted this Rule 9 application to consider the sole issue of whether the Trial Court erred in holding that communications between Jungling and Krystal's chief legal officer before June 9, 2014 could not qualify for attorney-client privilege.

"The law favors making all relevant evidence available to the trier of fact." *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002).  However, certain privileges may limit discovery where applicable.  So as to foster open communications between attorney and client, the law recognizes attorney-client privilege as one such privilege.  Attorney-client privilege is not absolute, and "[t]he communications must involve the subject matter of the representation and must be made with the intention that they will be kept confidential." *Id*. at 213 (Footnotes omitted).  Attorney-client privilege belongs to the client and may be waived by the client. *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984).  "When the third party in whose presence such communications take place is an agent of the client, the confidentiality is not destroyed." *Id*.  Appellate courts review a trial court's decision regarding attorney-privilege using the abuse of discretion standard. *Boyd*, 88 S.W.3d at 211.  "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

-5-

In *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the United States Supreme Court considered attorney-client privilege in the corporate context. In *Upjohn*, "[t]he communications at issue were made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel." *Id*. at 394, 101 S.Ct. 677 (Footnote omitted). The Court found that these "[c]ommunications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." *Id*. The Court concluded that "[c]onsistent with the underlying purposes of the attorney-client privilege, these communications must be protected against compelled disclosure." *Id* at 395, 101 S.Ct. 677.

In the present case, Jungling was not officially a Krystal employee. Nevertheless, some jurisdictions have extended attorney-client privilege to include parties who are the "functional equivalent of an employee." Our research did not yield any on-point, controlling Tennessee law on the subject. Therefore, we look to other jurisdictions for persuasive authority. The court in *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.* articulated a test for functional equivalency as follows:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, *In re Bieter*, 16 F.3d at 933-34; *Ross*, 2004 WL 67221, at *4, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, *In re Bieter*, 16 F.3d at 938; *In re Copper Market*, 200 F.R.D. at 219; *Ross*, 2004 WL 67221, at *4, and whether the consultant is likely to possess information possessed by no one else at the company, *In re Bieter*, 16 F.3d at 938.

*Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005).

On the other hand, some courts have balked at the functional equivalent doctrine. The court in *BSP Software, LLC v. Motio, Inc.* declined to apply the test, stating "[w]e are concerned that over time, the application of the functional equivalent test could expand the scope of the privilege by eroding the circumstances in which it can be waived" and that "even the most well-structured test may falter in the application." *BSP Software, LLC v. Motio, Inc.*, 2013 WL 3456870, at *3 (N. D. Ill. 2013).

Another court discussed a scenario whereby a plaintiff sought communications between a public relations firm and the corporation on whose behalf it was working:

> RLM was, essentially, incorporated into Sumitomo's staff to perform a corporate function that was necessary in the context of the government investigation, actual and anticipated private litigation, and heavy press scrutiny obtaining at the time. Sumitomo retained RLM to deal with public relations problems following the exposure of the copper trading scandal. Sumitomo's internal resources were insufficient to cover the task. RLM's public relations duties included preparing statements for public release and internal documents designed to inform Sumitomo employees about what could and could not be said about the scandal. RLM possessed authority to make decisions on behalf of Sumitomo concerning its public relations strategy. The legal ramifications and potential adverse use of such communications were material factors in the development of the communications. In formulating communications on Sumitomo's behalf, RLM sought advice from Sumitomo's counsel and was privy to advice concerning the scandal and attendant litigation.

> In addition, RLM's communications concerned matters within the scope of RLM's duties for Sumitomo, and RLM employees were aware that the communications were for the purpose of obtaining legal advice from Paul Weiss and/or Sumitomo's in house attorneys. Under the principles set out in *Upjohn*, RLM's independent contractor status provides no basis for excluding RLM's communications with Sumitomo's counsel from the protection of the attorney-client privilege. *Cf. McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (under *Upjohn*, there is no principled basis for distinguishing consultant's communications with attorneys and corporate employee's communications with attorneys when each acted in the scope of their employment).

> The Court therefore finds that, for purposes of the attorney-client privilege, RLM can fairly be equated with the Sumitomo for purposes of analyzing the availability of the attorney-client privilege to protect communications to which RLM was a party concerning its scandal-related duties. Accordingly, confidential communications between RLM and Sumitomo's counsel, or between RLM and Sumitomo, or among RLM, Sumitomo's in-house counsel and Paul Weiss that were made for the purpose of facilitating the rendition of legal services to Sumitomo can be protected from disclosure by the attorney-client privilege.

*In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) (footnote and record citations omitted).

The functional equivalent test takes into account a corporation's legitimate interest in relying upon frank exchanges between its legal counsel and non-employee individuals or organizations who behave as the functional equivalent of an employee. This approach acknowledges the reality of corporate activity and is in keeping with *Upjohn*. We, therefore, apply the functional equivalent test to determine whether the communications at issue may qualify for attorney-client privilege and whether in this instance the privilege "belongs" to Krystal.

Krystal argues that Jungling was the functional equivalent of one of its employees at least as of October 31, 2013, when Pendergast advised Jungling to "take lead" in the WASI matter, and Jungling did so. Denali argues in response that the parties' written agreements explicitly disclaimed any kind of agency relationship and that, at the relevant times, Jungling had no authority to act for Krystal on waste management issues. As a result, Denali contends, Jungling could not be considered a Krystal employee for purposes of attorney-client privilege and his communications with Krystal's chief legal officer are discoverable.

The documents before June 9, 2014 do establish a circumscribed role for Denali. We do not believe that ends the matter, however. We also are interested in how the parties actually conducted themselves. Emails in the record reflect that Jungling was a central player in Krystal's bid to make a change in its waste management business. Jungling had the ear of Krystal's President in these matters. Most decisively, Pendergast asked Jungling in his October 31, 2013 email that Jungling "take lead" with respect to the WASI matter. Jungling, thereafter, took a leading role indeed. The September 12, 2012 statement of work provides that "[a]ny procurement projects not covered in the scope of this agreement may be submitted to seller [Denali] via email." Krystal's President's email of October 31, 2013 to Jungling did exactly that. Jungling's activities following Pendergast's October 31, 2013 email could scarcely be distinguishable from those of a Krystal employee. Jungling was, in fact, the functional equivalent of a Krystal employee beyond that date. Despite the categorical provisions of the parties' written agreements disclaiming agency, we cannot ignore the parties' actual course of conduct.

Our holding that Jungling was the functional equivalent of a Krystal employee following October 31, 2013 extends to his employer, Denali, which possesses the communications at issue. Denali may understandably be chagrined at being unable to disclose its own records. However, a company acts through its employees. To hold that Jungling was the functional equivalent of a Krystal employee for purposes of attorney-client privilege but Denali was not would vitiate the protection afforded by the privilege

in the corporate context. Insofar as Jungling sought legal advice from Krystal's chief legal officer regarding the WASI contract after he was instructed to take lead on the WASI matter, Krystal was the client for purposes of attorney-client privilege and the privilege belongs to Krystal. Jungling, and by extension Denali, acted on behalf of Krystal in a very intimate and direct way. Krystal could justifiably rely upon confidentiality in consultations with its own lawyer.

In summary, we hold that Jungling was the functional equivalent of a Krystal employee as of October 31, 2013 when he was told by Krystal's President to "take lead" on Krystal's dealings with WASI, and that his subsequent communications with Krystal's chief legal officer may qualify for attorney-client privilege belonging to Krystal if these communications also otherwise qualify as privileged attorney-client communications. We make no determination on appeal as to the ultimate application of the privilege to specific communications between Jungling/Denali and Krystal's chief legal officer after October 31, 2013. We hold only that those communications qualify for attorney-client privilege under the functional equivalent test. We are not asked in this appeal to determine whether all the other elements necessary to make the communications subject to the attorney-client privilege are present. We, therefore, modify the judgment of the Trial Court to show that the functional equivalent employee test is satisfied as to the communications in question on appeal and remand this case for further proceedings consistent with this Opinion.

## Conclusion

The judgment of the Trial Court is modified, and this cause is remanded for further proceedings consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the Appellees, Waste Administrative Services, Inc., Denali Sourcing Services, Inc., and David Jungling.

_____
D. MICHAEL SWINEY, CHIEF JUDGE